STATE of Alaska, Appellant,

v.

Karen CARPENTER, Westwood One,
and Tom Leykis, Appellees.

Karen Carpenter, Appellant,

v.

Westwood One and Tom
Leykis, Appellees.

Westwood One and Tom
Leykis, Appellants,

v.

Karen Carpenter, Appellee.

Nos. S–10700, S–10709, S–10739.

Supreme Court of Alaska.

Oct. 26, 2007.

Jason T. Mogel, Assistant Attorney General, Anchorage, and Gregg D. Renkes, Attorney General, Juneau, for the State of Alaska.

Ray R. Brown and Linda M. O'Bannon, Dillon & Findley, P.C., Anchorage, and Jack B. McGee, Law Office of Jack B. McGee, Juneau, for Karen Carpenter.

Leslie Longenbaugh and L. Merrill Lowden, Simpson, Tillinghast, Sorensen & Longenbaugh, Juneau, for Westwood One and Tom Leykis.

Before: BRYNER, Chief Justice, MATTHEWS, EASTAUGH, FABE, and CARPENETI, Justices.

## OPINION

EASTAUGH, Justice.

## I. INTRODUCTION

Juneau resident Karen Carpenter wrote a letter to a Juneau radio station complaining about the Tom Leykis Show, a national radio talk show broadcast locally by the station. The station forwarded her letter to Tom Leykis, who read it on the air while making derogatory and sexually explicit remarks about Carpenter and making other comments that allegedly inflamed listeners and encouraged them to contact or confront Carpenter. Carpenter sued Leykis and his producer, Westwood One, for defamation, intentional and negligent infliction of emotional distress, and invasion of privacy. She also sued for spoliation of evidence, claiming Westwood One and Leykis intentionally destroyed the tape of part of the show. The superior court granted summary judgment against Carpenter on her defamation, negligent infliction of emotional distress, and false light privacy claims, but submitted her spoliation, intentional infliction of emotional distress (IIED), and "intrusion upon seclusion" claims to a jury. The jury found for Leykis and Westwood One on the IIED and intrusion claims and found for Carpenter against Westwood One on the spoliation claim and awarded her compensatory and punitive damages against Westwood One. The parties appeal rulings concerning the defamation, privacy, and IIED claims. Westwood One challenges the spoliation verdict and the damage awards. Carpenter disputes the constitutionality of allocating part of the punitive damages award to the State of Alaska, and she and the state raise questions about how that allocation should have been calculated. We reverse in part and remand because we conclude that Instruction No. 17 erroneously limited the jury's consideration of Carpenter's IIED claim. With a minor exception relating to costs, we otherwise affirm the superior court's rulings.

## II. FACTS AND PROCEEDINGS

Tom Leykis is a "radio personality"; in 1998 he hosted the Tom Leykis Show, a four-hour radio talk show. Sex-related topics were a common feature of the program. Westwood One, Inc. produced and distributed the show as a live radio program broadcast five days a week by radio stations nationwide. Juneau AM radio station KJNO broadcast the show weekdays from two to six p.m. in the Juneau area between June 8 and July 24, 1998.

Karen Carpenter, a Juneau resident, first heard the show on July 20, 1998. Carpenter testified at trial that she was concerned about its content, and expressed her concerns to a City and Borough of Juneau assembly member on July 21 and also made or tried to make various inquiries to other government officials asking about decency laws. Carpenter testified that she contacted "three or four" KJNO advertisers on July 22 and asked them if they knew their ads were being run during the Tom Leykis Show and whether they wanted their advertising dollars to support the content of the show. Carpenter then faxed KJNO a letter stating that she found "the majority" of the show "very offensive" and that she thought it was unsuitable to air when children might be listening. Her letter informed KJNO that she had contacted and would continue to contact Juneau radio advertisers whose ads ran during the Tom Leykis Show and that she would "do everything in [her] power to have the show taken off the air as soon as possible." The station placed the letter, which displayed Carpenter's fax number, in its "public file." Someone at KJNO faxed a copy of the letter to the Tom Leykis Show in California with a handwritten note, "Have fun." Carpenter testified that she was unaware that, as required by federal regulations, the letter would be placed in the station's public file.[1]

Around that time, Steve Rhyner, KJNO's station manager, decided to take the Tom Leykis Show off the air because major advertisers had complained about the program and Rhyner objected to the content of one particular show. July 24, 1998 was the last day the Tom Leykis Show was broadcast in Juneau.

During the July 24 broadcast, Leykis made several remarks about KJNO's cancellation of the show and Carpenter's letter. He described those who objected to the show as "some small band of old prunes and old blue-hairs, nut cases and all these cretins." He said: "[A]fter we go, keep an eye on our web site. I'm going to find out who these people are [who cancelled the show], and we'll put it up on the web site." He complained "I hate those—those old biddies who sit out there and have nothing better to do than to write in to radio stations." He also said: "Maybe if this woman had gotten laid in the last 50 years, who writes into the station and started making all these waves, maybe she wouldn't be complaining so much. I'm not kidding." After reading Carpenter's letter on the air, Leykis commented:

> And it's signed, the woman who wrote the letter—it's signed: Karen Carpenter. Well Karen, I have a little something that you could use right about now. [buzzing sound intended to simulate the sound of a vibrator]
>
> Sit on this, you old prune. Come on, get close to the radio. Get right on top of the speaker, baby. You moron. You jerk. You and your little band of nut cases out there, trying to decide what's going to be on the radio in Juneau, Alaska. You know, maybe you ought to go out and get laid once in awhile, huh? [buzzing sound]
>
> You cretin. Are your nipples getting hard yet, baby? Feel the power. You can't stop this show. Oh, you can stop Juneau, Alaska. But you can't stop me....
>
> You and your stupid—your stupid church and your stupid religion, and you and your stupid god damned bunch of marauders. You morons. Jerks.
>
> I'm enjoying this. I'm sporting wood right now, just thinking about it. Woo hoo....
>
> ....
>
> Oh, Karen Carpenter. Karen Carpenter wanted our show off the air. No, not that Karen Carpenter. But Karen, sit on it, baby. [buzzing sound]

---

1. 47 Code of Federal Regulations 73.1202 (2004) provides that

 All written comments and suggestions received from the public by licensees of commercial AM, FM, TV and Class A TV broadcast stations regarding operation of their station shall be maintained in the local public inspection file, unless the letter writer has requested that the letter not be made public or when the licensee feels that it should be excluded from the public inspection file because of the nature of its content, such as a defamatory or obscene letter.

 Carpenter has not contended that the public's right to comment about broadcast licensees is relevant to her claims, including her IIED claim.

Oh, yeah. See, if you got more of this, you wouldn't be writing complaint letters to the station.

Later in the show, a Juneau caller attempted to broadcast Carpenter's home telephone and fax numbers, which were listed in the local telephone directory under "K.L. Carpenter," and expressed the hope that people would "send her faxes." The telephone number was partially bleeped out. Around this time, according to the trial testimony of one of Carpenter's friends, Leykis also encouraged his listeners to make Carpenter's telephone "ring off the hook." Later in the program a Juneau fan called in to praise the show. Leykis responded: "Well, we hate to lose you, but like I say, stay tuned, 'cause we're going to get back on in Juneau.... And we're going to make that woman's life a living hell." According to the trial testimony of another of Carpenter's friends, this "living hell" comment was "used repeatedly throughout the broadcast."

Carpenter heard the first part of the broadcast and learned about other parts of the show from friends who had heard it. She testified later that she felt humiliated and sexually violated. She testified that she received a telephone message at her home that repeated part of what Leykis had said about her. She also received several "threatening" faxes at her home. Carpenter was later diagnosed with post-traumatic stress syndrome and an anxiety disorder.

The Tom Leykis Show was recorded in the studio on VHS videotapes as the show aired. These tapes were stored in a drawer in the studio; as soon as the drawer was full, the tapes were recycled, erasing the recordings. There were various estimates of how long the tapes stayed in the drawer. A Westwood One executive estimated they stayed there four to six months, while the show's producer testified that "judging by the size of the drawer, [the tapes] go back six to eight months, or approximately a year."

Carpenter wrote in an affidavit that she "believe[d]" she requested a copy of the July 24, 1998 tape from Westwood One and never received a response, and at trial she testified with certainty to having requested a copy. She also made several requests through her lawyers. Attorney Robert Reges testified that he sent an email to KJNO requesting a tape "soon after" the July 24 broadcast. An affidavit from KJNO employee Justin McDonald indicates that Reges did not identify himself as a lawyer, and did not admit the true purpose of his request.

On December 24, 1998, five months after the broadcast, another Carpenter attorney, Jim Douglas, wrote a letter to KJNO and Westwood One, requesting a tape and making it clear that legal action might be forthcoming. No address was given for Westwood One, just the name of the company and its street address in California. Westwood One employees testified that they had not seen the letter, but the show's producer testified to a general recollection that the company's legal department had requested the tape and that upon receiving such a request he would have made a copy of the tape and sent it to the legal department. He recalled that a copy "was found." He also testified that he "would not intentionally have altered or destroyed a tape of th[e] show, and that he did not do so." Douglas testified that he never received a response from Westwood One, and that KJNO told him that the station had forwarded the letter to Westwood One. The only copy of the July 24 show ever found was a cassette of the first two hours; KJNO's Justin McDonald provided this tape and recalled in an affidavit that Westwood One had sent him the tape "possibly before the end of 1998." He kept the cassette with his personal tapes and forgot about it until Steve Rhyner requested it in 2001. There was no evidence that a recording of the second half of the four-hour show ever surfaced.

Carpenter filed a superior court complaint against Tom Leykis, Westwood One, KJNO, Alaska Broadcast Communications, Inc., and Steve Rhyner. She alleged that Leykis's comments about her on his July 24, 1998 broadcast were defamatory, caused negligent and intentional infliction of emotional distress, and placed her in a false light. She also alleged that Leykis and Westwood One spoliated evidence.

Alaska Broadcast Communications, Westwood One, and Leykis filed summary judgment motions on all of Carpenter's claims on

grounds that Leykis's comments were protected by the First Amendment and that Carpenter was "a limited public figure on the issue of obscenity in the mass media." Carpenter filed a motion for partial summary judgment on her claims of intentional infliction of emotional distress (IIED), negligent infliction of emotional distress, invasion of privacy by way of false light publicity and intrusion upon seclusion, and spoliation of evidence. The trial court issued an order granting in part and denying in part the parties' cross-motions for summary judgment. It dismissed Carpenter's claims of defamation, negligent infliction of emotional distress, and false light invasion of privacy. The court declined to grant summary judgment to either side on Carpenter's claims of IIED, intrusion upon seclusion, and intentional spoliation of evidence.

A jury trial was held on those claims. Leykis and Westwood One moved for a directed verdict at the close of evidence and the trial court took their motion under advisement. The jury found that Westwood One had engaged in intentional spoliation of evidence and awarded Carpenter $5,042 in compensatory damages and $150,000 in punitive damages. The jury also returned a verdict for Leykis and Westwood One on Carpenter's claims of IIED and intrusion upon seclusion and for Leykis on her spoliation claim. As to the spoliation claim, Westwood One's directed verdict motion was converted to a motion for judgment notwithstanding the verdict. The trial court ruled that the directed verdict motions were moot as to the invasion of privacy and IIED claims; it denied the JNOV motion as to the spoliation claim.

Carpenter moved after trial for an order declaring AS 09.17.010(b) and AS 09.17.020(j) unconstitutional. Alaska Statute 09.17.010(b) imposes a cap on non-economic damages awards in personal injury and wrongful death cases. Because the jury's award did not include non-economic damages, the trial court dismissed as moot the portion of Carpenter's motion addressing AS 09.17.010(b). Alaska Statute 09.17.020(j) requires payment of fifty percent of a plaintiff's punitive damages award to the State of Alaska.[2] The trial court ruled that AS 09.17.020(j) was constitutional. Carpenter also objected to the form of the judgment proposed by the defendants; she argued that the court should deduct from the punitive damage award the contingent fee (including her costs) she owed her attorneys before the court awarded one-half of the remainder to the state. The State of Alaska intervened to protect its interest in the punitive damages award. The trial court ruled that it would deduct the contingent fee from the punitive damages award before distributing one-half of the balance of the award to the state. The trial court issued a final judgment on June 27, 2002. On September 20, 2002, it denied Carpenter's motion to deduct fifty percent of her costs from the state's portion of the punitive damages award.

Leykis, Westwood One, and Carpenter all moved for attorney's fees. The trial court denied all fees motions and ordered the parties to bear their own fees and costs.

In Case No. S–10709 Carpenter appeals the trial court's grant of summary judgment against her on her defamation and false light claims. She also appeals two jury instructions, two evidentiary rulings, the ruling on the constitutionality of AS 09.17.020(j), and the denial of her motion to deduct costs from the state's share of the punitive damages award.

In Case No. S–10739 Westwood One appeals the denial of its JNOV motion on the spoliation claim, and also appeals the constitutionality and amount of the punitive damages award; Westwood One and Leykis appeal the denial of their motion for prevailing party attorney's fees and costs.

In Case No. S–10700 the state appeals the pro rata deduction of Carpenter's attorney's contingency fee from the state's share of the punitive damages award.

## III. DISCUSSION

### A. The Superior Court Did Not Err in Granting Summary Judgment Against Carpenter on Her Defamation Claim.

Carpenter appeals the superior court's grant of summary judgment to Leyk-

---

**2.** AS 09.17.020(j).

is and Westwood One on Carpenter's defamation claim.[3] We review grants of summary judgment de novo,[4] considering the facts presented in a light most favorable to the non-movant to determine whether any genuine issues of material fact exist and whether the movant is entitled to judgment as a matter of law.[5] We apply our independent judgment to constitutional law issues.[6]

The elements of a defamation claim are: (1) a false and defamatory statement; (2) unprivileged publication to a third party; (3) fault amounting at least to negligence; and (4) either per se actionability or special damages.[7] A defamatory statement " 'tends to harm the reputation of another so as to lower [her] in the estimation of the community or deter third persons from associating or dealing with [her].' " [8] An expression of opinion is defamatory if the expression contains an implied assertion of false fact and is sufficiently derogatory as to cause harm to the subject's reputation.[9] It is not necessary that the communication actually cause harm to another's reputation; its character depends upon its general tendency to do so.[10] "If the context demonstrates to the audience that the speaker is not purporting to state or imply actual, known facts, the speech cannot be the basis for a defamation claim." [11]

The common law rule that a pure expression of opinion may serve as the basis for a defamation action was rendered unconstitutional by recent United States Supreme Court decisions. The Supreme Court has held that the First Amendment bars defamation actions if the allegedly defamatory statements are pure expressions of opinion, not implied or stated assertions of false fact.[12] The Court recognized that "[t]he freedom to speak one's mind is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." [13]

The superior court granted summary judgment against Carpenter on her defamation claim, reasoning that Leykis's statements "about Ms. Carpenter . . . [were] opinionated insults" protected by the First Amendment. The court held that Leykis's statements were "hyperbole, used only for shock value, and d[id] not state or imply any factual basis." We agree.

In *Sands v. Living Word Fellowship*, we explained: "[t]o ascertain whether a statement is factual, courts consider 'the type of language used, the meaning of the statement in context, whether the statement is verifiable, and the broader social circumstances in which the statement was made.' " [14] Many of

---

3. We refer to Tom Leykis and Westwood One collectively as "Leykis" unless context requires otherwise. On issues that Westwood One alone appeals, we refer to it by name.

4. *Treacy v. Municipality of Anchorage*, 91 P.3d 252, 260 (Alaska 2004).

5. *Botelho v. Griffin*, 25 P.3d 689, 692 (Alaska 2001).

6. *Alaska Legislative Council v. Knowles*, 21 P.3d 367, 370 (Alaska 2001).

7. *French v. Jadon Inc.*, 911 P.2d 20, 32 (Alaska 1996); *see also* RESTATEMENT (SECOND) OF TORTS § 558 (1977).

8. *Briggs v. Newton*, 984 P.2d 1113, 1120–21 (Alaska 1999) (quoting *French*, 911 P.2d at 32); *see also* RESTATEMENT (SECOND) OF TORTS § 559 (1977).

9. RESTATEMENT (SECOND) OF TORTS § 566 cmt. a (1977); *see also Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990).

10. *See* RESTATEMENT (SECOND) OF TORTS § 559 cmt. d (1977).

11. *Sands v. Living Word Fellowship*, 34 P.3d 955, 960 (Alaska 2001).

12. *See, e.g., Milkovich*, 497 U.S. at 19, 110 S.Ct. 2695 (rejecting wholesale defamation exemption of all statements in form of opinion, but holding that "statement on matters of public concern must be provable as false before there can be liability under state defamation law"); *see also Sands*, 34 P.3d at 960.

13. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 50–51, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 503–04, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984)).

14. *Sands*, 34 P.3d at 960 (quoting *Milkovich*, 497 U.S. at 24, 110 S.Ct. 2695 (Brennan, J., dissenting)).

Leykis's remarks about Carpenter were pure insults that were not factually verifiable. Even those statements that could constitute implied factual assertions, such as those about Carpenter's sexual habits, were not "factual" under the circumstances. No listener would understand Leykis's remarks about Carpenter's sexual habits to imply actual facts about Carpenter. Sex-related jokes were a common feature of the show. Even if Leykis's remarks implied that Carpenter was in fact sexually frustrated and deprived, no reasonable listener would believe that Leykis was purporting to reveal actual, known facts about Carpenter.[15] While Leykis's statements were offensive to any rational person, they were not defamatory.[16]

On appeal, Carpenter argues that the distinction between fact and opinion is inapposite because Leykis's statements fell within categories of speech that are not protected by the First Amendment. She offers three grounds on which to hold that the speech was unprotected: (1) it was indecent speech broadcast when children would likely hear it; (2) it was obscene; and (3) it constituted fighting words.

■ For her first argument she relies on the United States Supreme Court's decision in *FCC v. Pacifica Foundation.*[17] That decision does not support her claim, however, as it only decided whether the government has the power to regulate indecent speech that is broadcast by radio at times when children are likely to overhear it.[18] *Pacifica* held that indecent speech is not entitled to absolute constitutional protection and that under limited circumstances, the Federal Communications Commission may constitutionally regulate it. The agency may not prohibit the speech entirely, however; it may only channel the communication. Thus the speech is unprotected only insofar as it subject to the agency's time, place, and manner restrictions. The decision is therefore inapplicable to Carpenter's defamation claim.

■ Carpenter's other two arguments also fail. Leykis's statements, however offensive, do not satisfy the three-pronged test for obscenity set out in *Miller v. California.*[19] Likewise, they do not fall within the classic "fighting words" category of unprotected speech. The "fighting words" exception is limited to words that "by their very utterance . . . tend to incite an immediate breach of the peace."[20] Leykis's statements, uttered over the radio, were unlikely to achieve "an immediate breach of the peace." They may have encouraged listeners to retaliate against Carpenter, presumably by telephoning or faxing her at home. An exhortation for action of that sort is relevant to Carpenter's IIED claim. *See* Part III.C. But his words are insufficient to be the basis for a defamation claim based on a theory that Leykis uttered "fighting words."

## B. The Superior Court Did Not Err in Granting Summary Judgment Against Carpenter on Her False Light Invasion of Privacy Claim.

■ Carpenter argues that the superior court erred in granting summary judg-

---

15. *See Wilson v. Grant,* 297 N.J.Super. 128, 687 A.2d 1009 (App.Div.1996) (holding radio broadcaster's description of plaintiff as "stalker," "some little weasel," "a vicious swine," "a sick cookie," and "sick, no good, pot smoking, wife beating skunk" was not defamatory).

16. *See, e.g., Leidholdt v. L.F.P., Inc.,* 860 F.2d 890 (9th Cir.1988) (holding article describing Leidholdt and members of her organization as "pus bloated," "sexually repressed," "[h]ating men, hating sex, and hating themselves," and "frustrated group of sexual fascists" was not defamatory).

17. *FCC v. Pacifica Found.,* 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978).

18. *Id.* at 749–51, 98 S.Ct. 3026.

19. The three prongs of the *Miller* test are:

(a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole lacks serious literary, artistic, political, or scientific value.

*Miller v. California,* 413 U.S. 15, 24, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973) (citation omitted).

20. *Gooding v. Wilson,* 405 U.S. 518, 525, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (quoting *Chaplinsky v. New Hampshire,* 315 U.S. 568, 572, 62 S.Ct. 766, 86 L.Ed. 1031 (1942)).

ment to Leykis on her claim of false light invasion of privacy. A false light invasion of privacy claim arises when the defendant publicizes a matter that places the plaintiff before the public in a false light.[21] In many cases, the publicity is defamatory, although a plaintiff need not show injury to reputation to prevail on a false light claim.[22] An action for false light invasion of privacy differs from an action for defamation because a defamation claim redresses damage to reputation while a false light privacy claim redresses mental distress from exposure to public view.[23] Like defamation liability, however, false light liability requires at least knowing or reckless disregard of the falsity of the assertion of fact.[24] Because opinions cannot be proved false, they cannot give rise to false light liability.[25] Carpenter's false light invasion of privacy claim relies on the same statements that formed the basis for her defamation claim. It therefore fails. As we explained in Part III.A, Leykis's statements purportedly describing Carpenter were opinions, not false statements of fact.

## C. Jury Instruction No. 17 Potentially Prevented the Jury from Considering Carpenter's IIED Claim Against Leykis.

### 1. The claimed error

Instruction No. 18 expressly instructed the jury on the elements of Carpenter's intentional infliction of emotional distress (IIED) claim. But Carpenter argues that Instruction No. 17 erroneously restricted the jury's consideration of her IIED claim.

The text of Instruction No. 17 effectively prevented the jury from finding Leykis liable for words "spoken to or about" Carpenter unless the speech fell within either one of two narrow exceptions. Carpenter asserts that it was error to give that instruction because she was not a "public figure" and because even if Leykis's speech was entitled to some protection, the instruction erroneously stated the law as to her IIED claim.[26]

Carpenter contends that the jury must or could have applied Instruction No. 17 to her IIED claim, and that Special Interrogatory 1 also misdirected the jury as to that claim. That special interrogatory asked the jury to determine whether Leykis's remarks about Carpenter were "intended to provoke a hostile reaction under circumstances where a clear and present danger of immediate violence existed." Because the jury answered "No" to that interrogatory, Carpenter reasons that Instruction No. 17 and Special Interrogatory 1 "must have" caused the jury to believe that it "had no choice but to conclude that nothing Leykis said about Carpenter could support her IIED claim." She concludes that the instructional error was prejudicial and that a properly instructed jury could have found that Leykis's outrageous conduct caused Carpenter severe emotional distress. "That outcome is entirely likely," she reasons, given that in answering Special Verdict Form Question (11), the jury found Leykis's conduct to be "outrageous."

Leykis argues that Instruction No. 17 correctly stated the law and did not prejudice

21. The Restatement (Second) of Torts provides: One who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of privacy, if
(a) the false light in which the other was placed would be highly offensive to a reasonable person, and
(b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.
RESTATEMENT (SECOND) OF TORTS § 652E (1977).

22. RESTATEMENT (SECOND) OF TORTS § 652E cmt. b (1977).

23. *See Time, Inc. v. Hill,* 385 U.S. 374, 384 n. 9, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967).

24. *Id.* at 387–88, 87 S.Ct. 534; *Flowers v. Carville,* 310 F.3d 1118, 1132 (9th Cir.2002) (citing RESTATEMENT (SECOND) OF TORTS § 652E cmt. b (1977)).

25. *See White v. Fraternal Order of Police,* 909 F.2d 512, 518 (D.C.Cir.1990); *Leidholdt v. L.F.P. Inc.,* 860 F.2d 890, 893 (9th Cir.1988); *Rinsley v. Brandt,* 700 F.2d 1304, 1307 (10th Cir.1983).

26. Plaintiff's counsel objected at trial to Instruction No. 17's discussion of speech "intended to provoke a hostile reaction under circumstances where a clear and present danger of immediate violence existed."

the jury's consideration of the IIED claim. Citing Alaska cases,[27] he argues that speech may be punished in only "the most limited circumstances," and, citing *Hustler Magazine, Inc. v. Falwell*,[28] he argues that the First Amendment forecloses an IIED claim that is based on the same facts as a defective defamation claim. He contends that because Carpenter claimed "emotional distress inflicted through media speech," it was appropriate to instruct the jury on constitutional speech protections.

■■■■ The propriety of jury instructions generally raises questions of law that are subject to the independent judgment standard of review.[29] Jury instructions to which timely objections were made are therefore reviewed de novo.[30] Special verdict forms are subject to the same standard of review as other jury instructions.[31] Errors in jury instructions are not grounds for reversal unless the errors are prejudicial.[32] An erroneous instruction is prejudicial if it can be said that the verdict may have been different had the instruction not been given.[33]

### 2. The jury instructions, special interrogatory, and special verdict form

This claim of error requires us to consider the effect of Instruction No. 17, Instruction No. 18, Special Interrogatory 1, and parts of the special verdict form.

Instruction No. 17 told the jury it could not "consider" as a basis for liability "words spoken to or about" Carpenter unless the speech was unprotected for either of two reasons. It stated:

The law protects most speech. By example, statements of opinion, even if insulting or distasteful, are generally protected speech. It is only in limited circumstances that speech can be punished or be the basis of liability for damages. Therefore, you shall not consider words spoken to or about Karen Carpenter unless you find that the speech is not protected because of either of the following reasons:

(1) Speech that is intended to provoke a hostile reaction under circumstances where a clear and present danger of immediate violence exists is not protected speech.

(2) Publication of private factual information about an individual with knowledge or in reckless disregard that disclosure of the factual information would be highly offensive to a person of ordinary sensibilities is not protected speech. A fact is "private" if (a) it is not known to the public, that is, not a public record and not information legally available to the public or the media; and (b) the private fact is of a kind that, if publicized, would be highly offensive to a reasonable person; and (c) the private fact is not newsworthy, that is, of legitimate concern or interest to the public or an appreciable percentage of the public.

Instruction No. 18 explained the elements of Carpenter's IIED claim:

Karen Carpenter claims that Tom Leykis or Westwood One or its employees or agents intentionally inflicted emotional distress on her by virtue of a radio broadcast on July 24, 1998.

For Karen Carpenter to recover for this claim of intentional infliction of emotional distress, you must decide that it is more likely true than not true that Tom Leyk-

---

**27.** He cites *Turney v. State*, 936 P.2d 533, 541 (Alaska 1997), *Marks v. City of Anchorage*, 500 P.2d 644, 647 (Alaska 1972), and *Anniskette v. State*, 489 P.2d 1012, 1013 (Alaska 1971), for the proposition "that speech may be punished only in the most limited circumstances."

**28.** *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

**29.** *City of Kodiak v. Samaniego*, 83 P.3d 1077, 1082 (Alaska 2004).

**30.** *Glamann v. Kirk*, 29 P.3d 255, 259 (Alaska 2001).

**31.** *Coulson v. Marsh & McLennan, Inc.*, 973 P.2d 1142, 1150 n. 21 (Alaska 1999) (citations omitted).

**32.** *Id.*

**33.** *Beck v. State, Dep't of Transp. & Pub. Facilities*, 837 P.2d 105, 114 (Alaska 1992); *see also State, Dep't of Corr. v. Johnson*, 2 P.3d 56, 61 (Alaska 2000) (reversing for new trial where erroneous instruction made verdict for plaintiff more likely).

is'[s] or Westwood One['s] or its employee's conduct was extreme and outrageous and that he/they intentionally or recklessly caused Karen Carpenter severe emotional distress.

I will now define "extreme and outrageous conduct", "intentional", "reckless", "legal cause", and "severe emotional distress" for you.

There is no contention that this instruction was erroneous (although Leykis and Westwood One argue here, as they did below, that Carpenter's IIED claim should not have been submitted to the jury).

The superior court gave the jury special interrogatories with an instruction that it was to answer them before turning to the special verdict form. Special Interrogatory 1 asked: "Did Tom Leykis engage in speech related to Karen Carpenter that was intended to provoke a hostile reaction under circumstances where a clear and present danger of immediate violence existed?" The jury answered "No."

The court also gave the jury a special verdict form asking specific questions, including this question: "(1) Did Tom Leykis, by extreme and outrageous conduct, intentionally or recklessly inflict severe emotional distress on plaintiff Karen Carpenter?" The jury answered "No." The special verdict form also asked whether the jury found by clear and convincing evidence that "the conduct of Tom Leykis and/or Westwood One (or its employees or agents) was outrageous and thus subject to an award of punitive damages?" As to Leykis the jury answered "Yes."

### 3. Distinguishing between Carpenter's defamation/false-light claims and her IIED claims

The question we must decide here is whether, by prohibiting the jury from basing liability on "words spoken to or about" Car-

penter unless it found the speech was unprotected for one of the two specified reasons, Instruction No. 17 may have prevented the jury from fully considering Carpenter's IIED claim.[34] The question is important because the conduct that she asserts was outrageous consists largely of Leykis's conduct in speaking words "to or about" Carpenter during the broadcast. The instructions did not define the phrase "words spoken to or about." The literal and common-sense meaning of that phrase encompasses all words spoken "to" Carpenter, and all words spoken "about" her. This meaning renders the instruction applicable to all words Carpenter alleges were actionable. Some of those words described Carpenter in derogatory and humiliating terms and were central to the defamation and false-light claims that we held above were properly dismissed. But other words did not purport to describe Carpenter. A jury might interpret these other words as having been intended to invite listeners to contact her and make her life a "living hell." We are concerned here with determining whether the instruction potentially prevented the jury from fairly considering whether broadcasting these latter words was outrageous conduct that could be the basis for IIED liability.

We assume that an IIED claim that turns on the truth or falsity of speech is subject to the same limitations that protect speech from claims of defamation. Thus, just as actual malice must be proved by a public figure who is claiming defamation, actual malice must also be proved by a public figure who is claiming IIED based on the same speech that gives rise to a defamation claim.[35] Likewise, we assume that just as actual malice must be proved by a plaintiff claiming defamation that arises out of speech on a matter of public concern in Alaska,[36] actual malice must be proved by a plaintiff who bases a claim of IIED on the same speech.[37]

---

34. The dissenting opinion never addresses the adequacy of Instruction No. 17.

35. *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 52–53, 55–56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

36. *Pearson v. Fairbanks Publ'g Co.*, 413 P.2d 711, 715 (Alaska 1966).

37. *Cf. Falwell*, 485 U.S. at 52–53, 55–56, 108 S.Ct. 876 (holding under federal law that public figure claiming IIED based on defamatory nature of speech must prove actual malice).

■ Carpenter argues that the superior court erroneously considered her to be a public figure and that *Hustler Magazine, Inc. v. Falwell,*[38] which applied actual-malice defamation standards to an IIED claim brought by a public figure, consequently does not control Carpenter's IIED claim. The United States Supreme Court has identified two bases on which to find public figure status:

In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. · *More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.*[39]

A person in this second category is often referred to as a "limited-purpose public figure." [40]

We assume that whether Carpenter was a limited purpose public figure would be important to her IIED claim if that claim, like her defamation claim, turned on the truth or falsity of Leykis's words about Carpenter. If the falsity of those words were a necessary element of her IIED claim, whether she was a limited purpose public figure would deter-mine whether under federal law she had to prove actual malice to prevail on her IIED claim.[41] Likewise, if the falsity of those words were a necessary element of her IIED claim, we assume that Alaska law also would have required her to prove actual malice if Leykis's on-air comments to or about her forming the basis of her IIED claim were about a matter of public concern.[42]

■ But because her only viable claim is not based on the truth or falsity of Leykis's words about Carpenter and is not based on harm to her reputational interest, we conclude that the heightened protections due speech about public figures and matters of public concern do not altogether foreclose Carpenter's IIED claims. We therefore do not need to decide whether Carpenter was a public figure. In *Falwell,* the United States Supreme Court held that the First Amendment affords heightened protection to speech in the "area of public debate *about* public figures," regardless of whether the speaker's motivation was ill will, hatred, or mere desire to inflict emotional distress.[43] Heightened First Amendment protection does not extend to IIED claims based on speech that is not *about* a public figure or *about* a matter of public concern.[44] We distinguish between

**38.** 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

**39.** *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (emphasis added).

**40.** *Wolston v. Reader's Digest Ass'n,* 443 U.S. 157, 166, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979).

**41.** *Falwell,* 485 U.S. at 56, 108 S.Ct. 876.

**42.** *Cf. Mount Juneau Enters., Inc. v. Juneau Empire,* 891 P.2d 829, 838 (Alaska 1995) (applying actual malice standard to defamation claim arising out of newspaper article "concern[ing] matters of public interest").

**43.** *Falwell,* 485 U.S. at 53, 108 S.Ct. 876 (emphasis added).

**44.** The dissent contends that *Falwell* states that "public figures may not recover on claims of IIED without a showing of false statements of fact made with actual malice." Dissent at 77. But Falwell's IIED claim, unlike Carpenter's, turned on the falsity of the words describing Falwell. He therefore had to prove both a false-hood and actual malice to recover for either defamation or IIED. *Falwell* does not stand for the proposition that every IIED claim based on an utterance invariably requires proof of a false-hood. Permitting Carpenter to pursue an IIED claim that is not dependent on factual falsity does not permit her to evade the constitutional limitations that apply to her defamation claim.

The dissent asserts that we are reading *Falwell* too narrowly, "expos[ing] all opinion statements directed at public figures to IIED liability." Dissent at 78. But as we make clear, only Leykis's allegedly harassing conduct is exposed to IIED liability. His opinions, whether truthful or not, are protected.

The dissent may assume that the Court thinks defamation standards underlie every dispute arising out of a published utterance. That assumption would be incorrect. *Cf. Cohen v. Cowles Media Co.,* 501 U.S. 663, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991). In that case, Cohen pursued a promissory estoppel claim against the news company that truthfully identified him in news stories as its news source after promising him anonymity. Although the Minnesota Supreme Court held that allowing the claim would violate the First Amendment, the United States Supreme Court held that because Cohen was not attempting to use the claim "to avoid the strict

speech, however crude, somehow contributing to the public debate about a public figure or a matter of public concern or directed at persuading the ultimate target to change her mind about a matter of public concern, and speech intended merely to harass or cause others to harass the target. Speech of the latter sort is not entitled to First Amendment protection. A defendant's conduct in uttering words is therefore not invariably constitutionally protected from claims alleging the tort of outrage. Not all words are entitled to First Amendment protection. Instruction No. 17 implicitly, but incompletely, recognized the distinction in telling the jury of two limited examples of unprotected speech.

Unlike her defamation claim, Carpenter's IIED claim was not dependent on the truth or falsity of Leykis's words. Although her IIED claim as she presented it was based in part on what Leykis said in describing her, it was also based on what he seemed to urge his listeners to do and on related on-air statements directed at Carpenter that a jury might interpret as threats to organize an ongoing campaign of harassment against her. Her defamation and IIED claims both arose out of words Leykis allegedly spoke (or allegedly permitted others to speak) during the July 24 broadcast, and Leykis's conduct allegedly included the act of uttering or condoning those words.[45] But the essence of her defamation claim was the alleged falsity of Leykis's words purportedly describing Carpenter, whereas the essence of the viable part of her IIED claim was the alleged outrageousness of his conduct in provoking his listeners and inviting them, some of whom, like Carpenter, lived in Juneau, to harass Carpenter and, with him, make her life a "living hell." This was what the trial court characterized as Leykis's "call to arms." Likewise, Leykis's conduct allegedly included disclosing or allowing the disclosure or partial disclosure of Carpenter's home telephone and fax numbers to make it easier for audience members to contact her at home. Leykis's Brief of Appellee recognizes this distinction between the two claims in stating that her IIED claim was based on Leykis's conduct: "Ms. Carpenter's emotional distress claim was based on the allegation that Mr. Leykis provoked members of his radio listening audience to harass her and make her life 'a living hell,' and disclosed her home telephone and fax numbers to facilitate their doing so."

As we will see in discussing what is to be done on remand, that does not mean that what Leykis said "about" her was totally irrelevant to her IIED claim. But it does mean that it was essential that the jury be told accurately what consideration it could give to Leykis's words "to or about" Carpenter in deciding her IIED claim.

Such distinctions were drawn appropriately in *Esposito–Hilder v. SFX Broadcasting, Inc.*[46] A radio station there conducted an "Ugliest Bride" contest that disparaged plaintiff's appearance. The court allowed an IIED claim even though it recognized that no defamation claim could stand. It also observed:

> We are not unmindful of the constitutional issues implicated in this case and in our resolution thereof. In the quest for the proper accommodation between the right of redress for infliction of injury and the freedoms of speech and expression protected by the 1st Amendment, we have determined that the State's relatively strong interest in compensating individuals for harm outweighs the relatively weak 1st Amendment protection to be accorded defendants. It is elementary that not all speech or expression is to be accorded equal 1st Amendment protection; the most jealously protected speech is that which advances the free, uninhibited flow of ideas and opinions on matters of public interest

---

requirements for establishing a libel or defamation claim," permitting the claim did not offend the Constitution. *Id.* at 667, 671, 111 S.Ct. 2513. Consider also a public figure's IIED claim based on a published threat of harm. Not all IIED claims based on a published utterance invariably require proof of falsity and, for public figures, proof of actual malice.

**45.** The show was broadcast with a ten-second delay; Leykis could potentially prevent content from being broadcast.

**46.** *Esposito–Hilder v. SFX Broad., Inc.*, 236 A.D.2d 186, 665 N.Y.S.2d 697 (1997).

and concern; that which is addressed to matters of private concern, or focuses upon persons who are not "public figures", is less stringently protected [citing *Falwell*, 485 U.S. 46, 108 S.Ct. 876; *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985); *Gertz*, 418 U.S. 323, 94 S.Ct. 2997]. Moreover, among the forms of communication, broadcasting enjoys the most limited 1st Amendment protection [citing *FCC v. Pacifica Found.*, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) ].[47]

Likewise, there was sufficient evidence to permit a jury to find that Leykis's words in issuing his so-called "call-to-arms" departed from the bounds of protected speech. We assume that a broadcaster seeking to avoid cancellation in a local market may ridicule local critics, because debate about a show's cancellation is a matter of public interest and that those sorts of words are therefore protected at least qualifiedly by the First Amendment. But Leykis did not stop after speaking words that ridiculed or humiliated the person he claimed he thought responsible for the show's cancellation in Juneau. A reasonable jury could permissibly find that his "call-to-arms" words were "extreme and outrageous" within the meaning of the instruction defining "extreme and outrageous" conduct, because it could permissibly find that he intended those words to provoke listeners to harass her. We also note that his words were devoid of any express or implicit message that a jury might deem an attempt to persuade Carpenter, except perhaps out of fear of harassment, to withdraw her objections to broadcasting the show in Juneau.

We are unconvinced that submitting an IIED claim to a jury in such a case will unduly chill protected speech. To recover for intentional infliction of emotional distress, an IIED claimant must prove that there was "extreme and outrageous conduct" that intentionally or recklessly inflicted severe emotional distress.[48] As the jury was instructed here, conduct gives rise to an IIED claim only if it is "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[49] Therefore, as the jury was also instructed, "mere insults, indignities, threats, annoyances, petty oppressions or other trivialities" cannot form the basis of an IIED claim.[50] We have previously noted, and the jury was instructed here, that even harmful conduct "characterized by 'malice'" is insufficient to make out an IIED claim if the conduct is not "extreme and outrageous."[51] An IIED claim is therefore arguably no easier to prove than a defamation claim, even a defamation claim that must satisfy the "actual malice" standard. In addition, because IIED requires proof of an intentional or reckless mental state, an IIED plaintiff must show that "the defendant acted in deliberate disregard of a high degree of probability that the emotional distress will follow."[52]

47. *Id.* at 701.

48. *Finch v. Greatland Foods, Inc.*, 21 P.3d 1282, 1288 n. 21 (Alaska 2001) (citations omitted); *Richardson v. Fairbanks N. Star Borough*, 705 P.2d 454, 456 (Alaska 1985) (adopting the RESTATEMENT (SECOND) OF TORTS § 46(1) (1965) in defining a claim for IIED).

49. *Id.* at 1289.

50. *Id.* Compare *Lybrand v. Trask*, 31 P.3d 801, 802–05 (Alaska 2001) (affirming superior court's dismissal of IIED claim because neighbor's conduct in painting biblical slogans on roof was not "outrageous") and *Chizmar v. Mackie*, 896 P.2d 196, 209 (Alaska 1995) (affirming trial court's directed verdict based on conclusion that physician's alleged misdiagnosis of patient as HIV positive was not outrageous conduct even when

doctor failed to warn patient that screening test upon which diagnosis was based was unconfirmed) *with Teamsters Local 959 v. Wells*, 749 P.2d 349, 358 (Alaska 1988) (holding that threatening union member's life if he did not convince his supervisor-spouse to quit during strike was outrageous conduct as matter of law).

Considered in isolation, Leykis's derogatory words that merely ridiculed Carpenter would not give rise to an IIED claim. There is therefore no danger that they could be the basis for an IIED claim that might infringe on the First Amendment.

51. *Lybrand*, 31 P.3d at 803 n. 4 (quoting with approval RESTATEMENT (SECOND) OF TORTS § 46 cmt. d (1965)).

IIED claims must also satisfy other hurdles beyond those applicable to defamation claims. Injury is presumed from the fact of publication under defamation law.[53] In comparison, an IIED plaintiff must prove that she suffered severe emotional distress,[54] i.e., "distress of such substantial quality or enduring quantity that no reasonable person in a civilized society should be expected to endure it." [55] The requirements for an IIED claim are therefore inherently protective of most conduct; liability is allowed only if intentional or reckless conduct is extreme and outrageous and causes severe emotional distress. Claiming intentional infliction of emotional distress is consequently not a functional means of circumventing the restrictions on defamation claims.[56] This is particularly so since those IIED claims that are mere "clones" of defamation claims—because both turn on the words' falsity—will have to satisfy the actual malice standard if the plaintiff is a public figure or the speech concerns a matter of public interest.[57]

Finally, we are also confident that our trial courts can craft instructions that tell juries considering IIED claims how to distinguish between speech that can permissibly be the basis for finding outrageous conduct and speech that is protected. Even speech that relates to a matter of public interest loses its protection and can give rise to an IIED claim if, in addition to meeting the other requirements for an IIED claim, it is uttered with an intent merely to harass and with no intent to persuade, inform, or communicate.

So far, we have focused on state law. Because Leykis claims Carpenter is a limited purpose public figure under federal law, we must consider whether permitting the IIED claim to go forward may be contrary to the First Amendment.[58] We therefore consider whether the limitations applicable to Carpenter's IIED claim satisfy federal law.

The dissent characterizes Leykis's speech as opinion statements. Dissent at 79. Certainly some of Leykis's words purporting to describe Carpenter consisted of opinion statements. As we have recognized, those words cannot be the basis for defamation or IIED claims. But the dissent's characterization fails to recognize that jurors might fairly find that other words Leykis spoke or allowed to be broadcast were not statements expressing opinions, but statements intended to harass. As discussed above, the heightened intent we require here prevents the IIED claim from chilling protected speech, because we distinguish unprotected speech from speech expressing opinions or addressing matters of public concern. Even if the two types of speech are uttered contemporaneously, permitting a claim as to the unprotected speech will not chill protected speech. A speaker is not privileged to speak with an intent to harass even if she has just commented on important public issues.

Is harassing speech of the kind described above unprotected under federal law? Four kinds of speech have been recognized to date by the United States Supreme Court

**52.** *Chizmar v. Mackie,* 896 P.2d 196, 209 (Alaska 1995) (quoting *Tommy's Elbow Room, Inc. v. Kavorkian,* 727 P.2d 1038, 1044 (Alaska 1986)).

**53.** *Gertz,* 418 U.S. at 349, 94 S.Ct. 2997.

**54.** *Finch,* 21 P.3d at 1288.

**55.** *Fyffe v. Wright,* 93 P.3d 444, 456 (Alaska 2004) (quoting *Teamsters Local 959,* 749 P.2d at 359 n. 14).

**56.** *Cf. Cohen v. Cowles Media Co.,* 501 U.S. 663, 671, 111 S.Ct. 2513, 115 L.Ed.2d 586 (1991).

**57.** *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 52–53, 55–56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988); *Mount Juneau Enters., Inc. v. Juneau Empire,* 891 P.2d 829, 838 (Alaska 1995).

**58.** Our analysis of federal law makes it unnecessary for us to consider in this appeal whether Carpenter was a limited purpose public figure and the scope of that status. We assume that before a court applying federal law could hold that the actual malice privilege attached to Leykis's conduct during the nationwide broadcast, it would have to decide whether Carpenter was indeed a limited purpose public figure and, if she was, whether the privilege arising from that status was geographically or contextually limited. Carpenter was a Juneau resident locally challenging Juneau broadcasts of the show.

as wholly unprotected: obscenity,[59] fighting words,[60] true threats,[61] and words that create a "clear and present danger"[62] of "imminent lawless action."[63] Defamatory falsehood is also unprotected as to private figures, and is only protected as to public figures absent actual malice.[64] Leykis's comments do not fit into any of the first four categories, nor are they actionable as defamatory. But these five categories are useful guideposts to mark the boundary between words that comprise protected speech and words that comprise unprotected speech. With the possible exception of obscenity, words falling into one of the five categories are arguably unprotected speech not because of their informative content, but because they do more than merely disseminate information. They instead have an operative effect that would be actionable, and in some cases criminally punishable, whether that effect was accomplished by word or deed.

 Thus, uttering fighting words has the same impact as striking the first blow in an affray; uttering true threats is a form of assault that is purely verbal; and creating a clear and present danger of imminent lawless action is the verbal form of starting a riot or

insurrection. Defamation requires damage to another's reputation, a legally protected interest.[65] The tort of IIED protects one's interest in her physical and psychological integrity, a different legally protected interest.[66]

The United States Supreme Court dealt with the issue of harassment when it upheld an ordinance banning residential picketing.[67] In that case and several others, the Court expressed a special solicitude for the home, holding that "[o]ne important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, [citations omitted] the home is different."[68] The Court concluded, "[t]here simply is no right to force speech into the home of an unwilling listener."[69] Here, Carpenter claimed that her home telephone and fax numbers were disseminated.[70]

Decisions of the federal courts of appeals have held or recognized that telephonic harassment—whether effected by the conduct of making a telephone call with the intent to harass and hanging up or saying nothing, or by speaking to the victim—may

---

59. *Miller v. California*, 413 U.S. 15, 24–25, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

60. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72, 62 S.Ct. 766, 86 L.Ed. 1031 (1942).

61. *Virginia v. Black*, 538 U.S. 343, 359–60, 123 S.Ct. 1536, 155 L.Ed.2d 535 (2003) (citing *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969), and *R.A.V. v. City of St. Paul*, 505 U.S. 377, 388, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992)).

62. *Schenck v. United States*, 249 U.S. 47, 52, 39 S.Ct. 247, 63 L.Ed. 470 (1919).

63. *Brandenburg v. Ohio*, 395 U.S. 444, 447, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969).

64. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 327–28, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

65. *Time, Inc. v. Hill*, 385 U.S. 374, 386 n. 9, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) ("'[A]ll libel cases concern public exposure by false matter, but the primary harm being compensated is damage to reputation.").

66. RESTATEMENT (SECOND) OF TORTS § 46(1) (1965) (stating that one who engages in extreme and outrageous conduct is liable for emotional distress and any resulting bodily harm).

67. *Frisby v. Schultz*, 487 U.S. 474, 484, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

68. *Id.* at 484, 108 S.Ct. 2495.

69. *Id.* at 485, 108 S.Ct. 2495. *See also Carey v. Brown*, 447 U.S. 455, 470–71, 100 S.Ct. 2286, 65 L.Ed.2d 263 (1980); *FCC v. Pacifica Found.*, 438 U.S. 726, 748, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978); *Rowan v. Post Office Dep't*, 397 U.S. 728, 737, 90 S.Ct. 1484, 25 L.Ed.2d 736 (1970).

70. The dissent does not challenge our statement that the Supreme Court in *Frisby* expressed a special solicitude for the home. Dissent at 81. But it does imply that we are "penalizing rhetoric because it may have encouraged listeners to contact [Carpenter]." Dissent at 81. That is not what we are doing. We are instead recognizing that harassment of even public figures is actionable if the claimant can prove the elements of IIED and can prove that the intended purpose of the words was merely to harass. If Leykis had merely "encouraged listeners to blanket Carpenter with objections to the show's cancellation," his speech would not have been intended to "merely harass" and would not be actionable.

be criminally punished.[71] These opinions suggest that a law must cover both harassing speech and conduct to withstand constitutional scrutiny. The tort of IIED clearly pertains to both speech and conduct, and our ruling is consistent with the D.C. Circuit's statement in *United States v. Popa*, that harassing speech made with no intent to contribute to the "public or political discourse" may be criminally punished.[72]

We therefore conclude that our holding here is consistent with current First Amendment precedent.

### 4. Effect of Instruction No. 17

Instruction No. 18 properly instructed the jury on the elements of an IIED claim. But the jury was not informed that Instruction No. 17 did not apply to Carpenter's claim that Leykis's conduct was outrageous, or that in considering the IIED claim the jury might or should distinguish between his merely derogatory words about Carpenter and his words that arguably were intended to invite harassment. In essence Leykis argued that everything he said was protected "speech," and that Special Interrogatory 1 used "speech" as a synonym for conduct or acts "intended to provoke a hostile reaction." Special Interrogatory 1 similarly treated the claim of provoking a hostile reaction as falling within paragraph (1) (the "hostile reaction" exception) of Instruction No. 17. Special Interrogatory 2 likewise equated the conduct of disclosing private factual information with the other exception, contained in paragraph (2) of Jury Instruction No. 17. Because the IIED claim arose out of words that Leykis spoke or allowed to be spoken on the air and because those words were "to or about" Carpenter, the jury was unable to consider the IIED claim without applying Instruction No. 17.

Leykis argues that Instruction No. 17 correctly stated the law and did not prejudice the jury's consideration of the IIED claim. We are unconvinced that the jury must have understood that Instruction No. 17 did not apply to the IIED claim. Given the breadth of Instruction No. 17, it is probable the jury thought it did apply to that claim.

■ We are also unconvinced that Carpenter, to prevail on her IIED claim, should have been required to prove that Leykis's speech fell under one of the two categories of unprotected speech described in Instruction No. 17. Instruction No. 17's "hostile reaction" exception restates the classic "fighting words" exception.[73] But conduct consisting

---

71. *Gormley v. Dir., Conn. State Dep't of Prob.*, 632 F.2d 938, 941–42 (2d Cir.1980) (holding that Connecticut may criminally punish harassing phone calls because the statute punishes both harassing conduct and speech); *United States v. Lampley*, 573 F.2d 783, 787 (3d Cir.1978) (holding that "[t]he appellant has not claimed, nor could he successfully do so, that it is beyond the power of the Congress to impose criminal sanctions on the placement of interstate telephone calls to harass, abuse or annoy"); *Walker v. Dillard*, 523 F.2d 3, 4–6 (4th Cir.1975) (state statute making it a misdemeanor to "curse or abuse anyone, or use vulgar, profane, threatening or indecent language over any telephone" struck down as vague and overbroad because the state had not given the law a narrowing construction, but also stating that "[w]e start from the proposition that the state has a legitimate interest in prohibiting obscene, threatening, and *harassing* phone calls, none of which are generally thought of as protected by the First Amendment") (emphasis added, citations omitted).
 *Cf. United States v. Popa*, 187 F.3d 672, 676–77 (D.C.Cir.1999) (striking down statute upheld in *Lampley* due to lack of exception for "public or political discourse," but recognizing that government's interest "in the protection of innocent individuals from fear, abuse or annoyance at the hands of persons who employ the telephone, not to communicate, but for other unjustified motives" was "important or substantial").

72. *United States v. Popa*, 187 F.3d 672, 676–77 (D.C.Cir.1999). The dissent reads that case as concluding that "political communication with a public figure on a matter of public concern is protected speech." Dissent at 82. That holding is consistent with our holding that speech can be punished if made with the "intent merely to harass and with no intent to persuade, inform, or communicate." As did the court in *Popa*, we exclude from our holding "those who intend to engage in public or political discourse." *Popa*, 187 F.3d at 677. Decisions of the Courts of Appeal for the Second and Third Circuits uphold anti-harassment statutes—even though they do not contain a political speech exception—because they target conduct. *See supra* note 71. Like the anti-harassment statutes, the tort of IIED as applied to Carpenter's claim addresses the allegedly harassing conduct.

73. *Brandenburg v. Ohio*, 395 U.S. 444, 447–48, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969); *see also Marks v. City of Anchorage*, 500 P.2d 644, 647 (Alaska 1972).

of speech can be found to be outrageous if a jury finds that the speaker intended to harass by provoking a widespread audience to react with hostility toward the target of humiliating and demeaning comments. A jury could reasonably determine that Leykis encouraged his listeners to be angry with Carpenter and to contact her and harass her. There is no reason why an IIED plaintiff under such circumstances must prove that there is in fact a clear and present danger of immediate violence; so long as Leykis acted with the requisite intent to harass, it is enough that a reasonable person could think that his comments were likely to prompt listeners to contact or communicate with Carpenter in a hostile fashion, thus accomplishing his objective. In short, the "hostile reaction" exception did not accurately describe Carpenter's IIED claim, and made it more difficult for her to prevail on that claim. The instruction's exception for publication of private factual information was equally inapplicable, and equally potentially prejudicial.

There is no basis for thinking the verdict would have been the same if it had been clear to the jury that Carpenter's IIED claim only had to satisfy Instruction No. 18 and did not also have to satisfy Instruction No. 17, at least as to that part of the IIED claim based on broadcasting the "call to arms." The evidence fairly described in a manner favoring Carpenter would have permitted reasonable jurors to find that Leykis's conduct was extreme and outrageous. In allowing the IIED issue to go to the jury, the trial court apparently assessed the evidence the same way, even though the trial court had post-trial qualms about the claim.

Furthermore, as Carpenter argues, the jury's answers to the special verdict form may imply that Instruction No. 17 and Special Interrogatory 1 actually affected the IIED verdict. In answering Special Verdict Form Question (11), the jury found by clear and convincing evidence that Leykis's conduct was "outrageous and thus subject to an award of punitive damages." But in answering Special Verdict Form Question (10) the

jury found that Leykis had no responsibility for the spoliation of the July 24 tape. Taken together, these answers may indicate that the jury found that Leykis's on-air conduct was outrageous. This in turn may indicate that the jury rejected Carpenter's IIED claim only because his conduct did not satisfy the "immediate violence" element that was discussed in Instruction No. 17, expressly required by Special Interrogatory 1, and impliedly required by Special Verdict Form Question (1).

We therefore hold that Instruction No. 17 potentially prevented the jury from giving fair consideration to Carpenter's IIED claim. Remand for a new trial on the IIED claim is consequently necessary. The jury on remand should consider whether Leykis's conduct, when viewed in its entirety: "(1) was extreme and outrageous, (2) was intentional or reckless, and (3) caused [Carpenter] severe emotional distress." [74]

### 5. Instructions on Remand

Conduct in broadcasting the "call to arms" and encouraging listeners to take harassing action against Carpenter was not protected speech and may be the basis for IIED liability. Nonetheless, some of Leykis's comments about Carpenter and her actions in trying to have his show taken off the air in Juneau cannot be the sole basis for her IIED claim. There are two reasons why: First, the derogatory comments are entitled to some speech protections because debate about whether a nationally broadcast radio show should no longer be aired in Juneau is potentially a matter of public importance in Alaska. Offensive as the derogatory comments about Carpenter would be to persons of normal sensibilities, they arguably challenge the credibility of the person Leykis identified as being responsible for the cancellation. They attacked the wisdom and need for cancellation by attacking that person and her values. Under Alaska law, therefore, they addressed a matter of public interest and are qualifiedly privileged.[75] They consequently cannot

---

74. *Finch v. Greatland Foods, Inc.*, 21 P.3d 1282, 1288 (Alaska 2001).

75. These words are not defamatory, for reasons we discussed in Part III.A. We therefore do not need to consider whether under federal law Carpenter was a limited purpose public figure and

themselves be the sole basis for her IIED claim unless Leykis abused the privilege.[76] Second, to the extent the derogatory words were arguably germane to the show's cancellation, a topic of public interest, speaking them cannot be considered outrageous conduct.

■ But the derogatory comments remain potentially relevant to Carpenter's IIED claim. As to that claim, the jury on remand may consider how Leykis's derogatory comments bore on whether it was extreme and outrageous to encourage listeners to contact Carpenter or harass her. It might think his comments were intended to incite listeners to act on his arguable invitation to take harassing action against her and increased the foreseeability and likelihood that some would do so. In this, the comments bear on whether Leykis acted with the mental state required for an IIED claim. Finally, the words may also be relevant to the question whether Carpenter suffered severe emotional distress.

Instructions on remand should therefore distinguish between those aspects of the July 24 broadcast that may not be the basis for an IIED claim and those that may. We will not try to draw that distinction here. It is fact-intensive and the trial court is in the best position to assess the words' probative value and the potential for undue prejudice. Moreover, the parties have not really tried to distinguish between comments that might legitimately be the basis for finding outrageous conduct, comments that may not themselves be the basis for an IIED claim but may nonetheless be relevant to that claim, and any comments that the jury cannot be allowed to consider on the issue of IIED liability. We recognize the potential difficulty of drawing the line accurately. But we are also confidant the trial court will be able to make clear to the jury on remand the extent to

which it may or may not consider such comments in deciding the IIED claim.[77]

**D. The Superior Court's Refusal To Admit into Evidence Carpenter's Compendium of Broadcast Excerpts and Evidence of Leykis's Salary Was Not an Abuse of Discretion.**

■ Carpenter argues that the trial court abused its discretion in refusing to admit into evidence a one-hour compendium of excerpts from broadcasts of Leykis's show between May 2000 and August 2001. All of the excerpts in the compendium were from shows broadcast after the July 24, 1998 program at issue. The compendium consists of segments from twenty-four taped broadcasts.

Carpenter contends that the exhibit "established that Leykis intentionally and routinely denigrated and attacked women." She asserts that the compendium demonstrates that Leykis intended to inflict emotional distress on Carpenter and that he intentionally disseminated Carpenter's personal information. She argues that the broadcasts establish Leykis's intent to injure her by revealing his antipathy toward women and, by extension, her.

The trial court refused to admit the entire compendium. It ruled that while the compendium might tend to show Leykis's attitudes toward women, its prejudicial effect outweighed its probative value.

■ We review evidentiary rulings for abuse of discretion, although whether the trial court applied the correct legal standard presents a question of law that we review de novo.[78]

Alaska Rule of Evidence 403 permits exclusion of relevant evidence if its probative value is outweighed by the danger of unfair prejudice. Evidence that Leykis hated wom-

whether actual malice in uttering these words might give rise to both a defamation claim and an IIED claim.

76. We consider here only the words Leykis allegedly spoke about Carpenter. We do not consider whether other descriptive words would invariably be qualifiedly protected.

77. Carpenter also challenges the superior court's rejection of her proposed Instruction No. 15. Because the instruction was not justified by either Carpenter's IIED claim or her spoliation claim, the superior court's refusal to give the instruction was not reversible error.

78. *Smithart v. State,* 988 P.2d 583, 586 (Alaska 1999).

en may lend support to Carpenter's claim that Leykis intentionally or recklessly caused her to suffer emotional distress, but its probative value is slight. The prejudicial effect, on the other hand, is potentially great. As the trial court pointed out, the compendium included distasteful and offensive remarks that were likely to prejudice the jury against Leykis, particularly because it was composed of "snippets" (as the trial court characterized them) taken out of context. The court did not preclude Carpenter from playing particular passages to impeach Leykis if he denied ever having said particular things or ever having acted in a particular fashion while broadcasting. We conclude that the trial court did not abuse its discretion in denying admission of the entire compendium.

■ Carpenter also argues that the trial court's refusal to allow cross-examination of Leykis on the terms and amount of his annual compensation as host of the show was an abuse of discretion. The trial court granted Leykis's motion for a protective order because the evidence was not relevant to the core issues of the case:

> At best, the fact that Mr. Leykis receives compensation for his work is relevant to show that he wants to go on making a salary. In contrast, the Leykis compensation could be misused or misunderstood by the jury as a potential yardstick for damages. In this particular case, there is already risk that the jury could impose liability based on their dislike of the content of the radio show in general as opposed to determining the narrow liability issues presented. The probative value of this salary information is outweighed by the potential for undue prejudice.

Carpenter has not persuaded us that the trial court abused its discretion in granting the protective order.

### E. The Superior Court Did Not Err in Denying Westwood One's Motion for a Directed Verdict on the Spoliation of Evidence Claim.

■ The jury found that Westwood One (but not Leykis) committed the tort of spoliation of evidence by destroying the tape of the show and awarded Carpenter $5,042 in compensatory damages and $150,000 in punitive damages against Westwood One. The act of "–'[s]poliation' is the destruction or alteration of evidence,"[79] or its "intentional concealment . . . until it is destroyed by natural causes."[80] Although this court has not laid out the exact elements of the spoliation tort, it is clear that a viable underlying cause of action must accompany a spoliation claim,[81] that a plaintiff must show that the spoliation occurred "with the intent to disrupt [the plaintiff's] prospective civil action,"[82] and that the spoliation must have prejudiced the prosecution of the action.[83] Westwood One argues that it should have received a directed verdict on the spoliation claim because there was no viable underlying cause of action and because there was insufficient evidence of intent.

■ In reviewing a trial court's denial of a motion for directed verdict, we "determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable persons could not differ in their judgment as to the facts."[84] " 'If there is room for diversity of opinion among reasonable people, the question is one for the jury.' "[85]

#### 1. The IIED claim was viable.

■ "An action based on the tort of spoliation is meritless unless it can be shown that a party's underlying cause of action has been prejudiced by the spoliation. . . . Therefore, in order for [a plaintiff] to prevail on [her]

**79.** *Estate of Day v. Willis*, 897 P.2d 78, 80 n. 2 (Alaska 1995) (citation omitted).

**80.** *Hibbits v. Sides*, 34 P.3d 327, 330 (Alaska 2001).

**81.** *Day*, 897 P.2d at 81.

**82.** *Sweet v. Sisters of Providence in Wash.*, 895 P.2d 484, 492 (Alaska 1995).

**83.** *Day*, 897 P.2d at 81.

**84.** *Ben Lomond, Inc. v. Schwartz*, 915 P.2d 632, 635 (Alaska 1996).

**85.** *Petersen v. Mut. Life Ins. Co. of N.Y.*, 803 P.2d 406, 410 (Alaska 1990).

spoliation claim, [her] underlying cause of action ... must be viable." [86] We have not articulated what is required for a cause of action to be considered "viable" in this context. Only once have we encountered the "viability" element of the claim, in *Estate of Day v. Willis*.[87] We there determined that the underlying claim was not viable because it relied on a duty that we concluded did not exist.[88] Because a jury could reasonably find that the uncontested evidence of Leykis's conduct satisfies the elements of an IIED claim, that claim was viable.

■ Carpenter's intentional infliction of emotional distress claim had three elements. She was required to prove that Leykis's broadcast "(1) was extreme and outrageous, (2) was intentional or reckless, and (3) caused [Carpenter] severe emotional distress." [89] Westwood One challenges only the first element. Leykis's action was sufficiently outrageous to make out an IIED claim if it was "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." [90] Although "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities" cannot be the basis of an IIED claim,[91] a properly instructed jury could find that Leykis's conduct discussed above in Part III.C was sufficiently outrageous for IIED liability. Similarly, a jury could find that it was foreseeable that a citizen, allegedly targeted and humiliated by Leykis on national radio before admiring listeners who seemed predictably inflamed by his comments, would suffer emotional dis-

tress upon realizing that Leykis had probably caused thousands of strangers to loathe her and that some of them might act on his seeming invitation to harass and confront her.

### 2. There was sufficient evidence of Westwood One's intent to disrupt Carpenter's claim.

■ A reasonable jury could find that Westwood One spoiled the tape with the "intent to disrupt the underlying litigation." [92] Attorney Jim Douglas's letter to KJNO and Westwood One informed the company of the potential for legal action. Westwood One was thereafter on notice of the potential claim.[93] If credited, there was testimony that implied that the tape was handed over to the legal department. The evidence could therefore establish the requisite intent.[94] It was not error to submit the claim to the jury.

### F. The Punitive Damages Award for the Spoliation Claim Was Not Excessive.

■ Westwood One challenges the $150,000 punitive damages award, claiming it is "grossly excessive." We "review de novo the question of whether punitive damages are grossly excessive and thus unconstitutional under the due process clause of the Fourteenth Amendment." [95]

■ Westwood One argues that the award is outside the vague boundaries set out by the United States Supreme Court in

86. *Day*, 897 P.2d at 81 (citation omitted).

87. *Id.*

88. *Id.* at 80–82.

89. *Finch v. Greatland Foods, Inc.*, 21 P.3d 1282, 1288 (Alaska 2001).

90. *Id.* at 1289.

91. *Id.*

92. *Hibbits v. Sides*, 34 P.3d 327, 330 (Alaska 2001).

93. *See Brumfield v. Exxon Corp.*, 63 S.W.3d 912, 920 (Tex.App.2002) (holding no intentional spoli-

ation occurred where defendant was not on notice that evidence was relevant to claim).

94. *Cf. Sweet v. Sisters of Providence in Wash.*, 895 P.2d 484, 492 (Alaska 1995) (considering spoliation negligent, not intentional, when hospital failed to "create and preserve" records); *Buzbee v. Ala. Waste Servs., Inc.*, 709 So.2d 61, 66 (Ala. Civ.App.1998) (refusing to apply spoliation doctrine in absence of any evidence tending to prove intent).

95. *Cent. Bering Sea Fishermen's Ass'n v. Anderson (Anderson I )*, 54 P.3d 271, 277 (Alaska 2002).

*BMW of North America, Inc. v. Gore*[96] and *State Farm Mutual Automobile Insurance Co. v. Campbell.*[97] These cases hold that a "grossly excessive" punitive damages award violates the Due Process Clause.[98] *Gore* provides three "guideposts" for determining when an award is unconstitutional: (1) the "degree of reprehensibility" of the tortious conduct; (2) "the disparity between the harm or potential harm suffered by [the plaintiff] and [the] punitive damages award"; and (3) "the difference between [the punitive damages award] and the civil penalties authorized or imposed in comparable cases."[99]

 We do not find that the first factor—reprehensibility—is met.[100] The next factor is the ratio between the punitive damages award and the harm caused by the tortious conduct (generally measured by the compensatory damages awarded). While the Supreme Court is reluctant to actually draw a line, it has said that a ratio of four to one is "close to the line" of constitutionality.[101] The ratio between Carpenter's punitive damages award of $150,000 and her compensatory award of $5,042 is nearly thirty to one, off the allowable scale. Nonetheless, the relatively low compensable damages on the spoliation claim would potentially justify a high ratio.

The third factor is the difference between the punitive damages award and the civil penalties authorized or imposed in comparable cases. Carpenter argues that a comparison between the punitive damages award and

the criminal penalty for evidence tampering under AS 11.56.610(a)(1) supports the constitutionality of the award. While Westwood One correctly points out that it probably could not have been convicted of tampering on such limited evidence of intent, the Supreme Court's comparison between punitive damages and statutory penalties has not depended on a finding that the exact conduct subject to punitive damages would be subject to the other penalties. Instead, the Supreme Court has considered the penalties "imposed in *comparable* cases."[102] Similarly, the Supreme Court in *Pacific Mutual Life Insurance Co. v. Haslip* looked to the fines that could be levied for insurance fraud in general, without considering whether the defendant's particular conduct would warrant such a fine.[103] Thus, it is appropriate to consider the fines for evidence tampering. The fines can be as much as $1,000,000, a figure well above the punitive damages award here.[104] This factor therefore weighs in favor of the constitutionality of the award.

Finally, we note that punitive damages may sometimes be the *only* appropriate damages recoverable for spoliation, especially when the jury finds no liability for the underlying claims. It is difficult to see how spoliation can cause harm other than by denying the plaintiff the opportunity to fully prosecute the underlying claims. Compensatory damages cannot reflect much besides speculation as to how the underlying claims would have turned out if the evidence had not been

---

**96.** *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**97.** *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

**98.** *Id.* at 416–18, 123 S.Ct. 1513; *Gore*, 517 U.S. at 568, 116 S.Ct. 1589.

**99.** *Gore*, 517 U.S. at 574–75, 116 S.Ct. 1589.

**100.** Reprehensibility is determined by factors including whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was

the result of intentional malice, trickery, or deceit, or mere accident.
*State Farm*, 538 U.S. at 419, 123 S.Ct. 1513. Westwood One's conduct only meets two factors (causing physical harm and acting deceitfully).

**101.** *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). *Cf. Norcon, Inc. v. Kotowski*, 971 P.2d 158, 179–80 (Alaska 1999) (Eastaugh, J., concurring) (approving high ratio where compensatory damages are small relative to expense of litigation).

**102.** *Gore*, 517 U.S. at 575, 116 S.Ct. 1589 (emphasis added).

**103.** *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23–24, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

**104.** AS 11.56.610; AS 12.55.035(c)(1)(A).

spoiled. Punitive damages, providing retribution and deterrence, are particularly appropriate for this tort.[105] We hold, therefore, that the punitive damages award for Carpenter's spoliation claim was not excessive.

On remand, Carpenter's IIED claim may provide an independent ground for a punitive damages claim. If punitive damages are sought on retrial of that claim, any award must not result in double recovery, i.e., must not twice punish the same defendant for the same conduct.

### G. Alaska Statute 09.17.020(j) Is Constitutional.

■ Carpenter appeals the superior court's denial of her motion seeking a declaration that AS 09.17.020(j) is unconstitutional. Alaska Statute 09.17.020(j) provides:

If a person receives an award of punitive damages, the court shall require that 50 percent of the award be deposited into the general fund of the state. This subsection does not grant the state the right to file or join a civil action to recover punitive damages.

We review the issue de novo.[106]

■ Carpenter challenges the constitutionality of AS 09.10.020(j) on two grounds. First, she argues that it violates the separation of powers doctrine. She theorizes that the legislature exceeds the power granted it under the Alaska Constitution when it compels a judge to issue a judgment that contradicts a reasonable jury verdict. She argues

that the content of a final judgment is the exclusive concern of the courts.

We addressed a similar issue in *Evans ex rel. Kutch v. State,* in which we held that the statutory caps on noneconomic and punitive damages did not amount to a remittitur that violated the separation of powers doctrine.[107] Although the dispositional opinion's separation of powers analysis did not discuss the validity of the allocation statute, we adopt that analysis today in rejecting Carpenter's separation of powers challenge to AS 09.10.020(j). In *Evans,* the dispositional opinion reasoned that because they applied generally to all cases and were not case- or fact-specific, the damage caps did not amount to a remittitur.[108] The dispositional opinion concluded that the damages caps therefore did not violate the separation of powers, and stated that "the power of the legislature to modify or abolish the common law 'necessarily includes the power to set reasonable limits on recoverable damages in causes of action the legislature chooses to recognize.' " [109]

Likewise, it is within the legislature's power to mandate the award of a portion of the punitive damages to the state. Just as the legislature may require the trial court to cap the jury's damages awards, it may require the court to allocate half of the punitive damages award to the state.

■ Carpenter next argues that AS 09.10.020(j) results in an unconstitutional taking.[110] We rejected an identical argument in

**105.** We have contemplated, without so ruling, the possibility of a punitive damages award for a spoliation claim even if no compensatory damages were awarded. *Hazen v. Municipality of Anchorage,* 718 P.2d 456, 464 n. 10 (Alaska 1986).

**106.** We review the constitutionality of AS 09.17.020(j) de novo, adopting the rule of law that is most persuasive in light of precedent, policy, and reason. *Anderson v. State ex rel. Cent. Bering Sea Fishermen's Ass'n (Anderson II ),* 78 P.3d 710, 713 (Alaska 2003).

**107.** *Evans ex rel. Kutch v. State,* 56 P.3d 1046, 1055 (Alaska 2002) (discussing AS 09.17.010 and .020 caps on noneconomic and punitive damages, respectively). The four-member court unanimously upheld the punitive damages cap but was evenly divided on the constitutionality of the noneconomic damages cap and the punitive

damages allocation statute. Justice Eastaugh joined the dispositional opinion written by Chief Justice Fabe; Justices Bryner and Carpeneti dissented. The dissent argued that the noneconomic damages cap violated the right to a jury trial and equal protection but did not address the separation of powers issue. *Id.* at 1070–75.

**108.** *Id.* at 1056.

**109.** *Id.* at 1055–56 (quoting *Franklin v. Mazda Motor Corp.,* 704 F.Supp. 1325, 1336 (D.Md. 1989)).

**110.** The Fifth Amendment of the United States Constitution, applied to the states through the Fourteenth Amendment, provides in general terms that private property shall not be taken for public use, without just compensation. Similarly, article I, section 18 of the Alaska Constitution

*Reust v. Alaska Petroleum Contractors, Inc.*[111] We there held that an unlitigated claim does not become "property" until after it accrues.[112] Because claims are defined by the law that exists when they accrue, any claim accruing after the August 7, 1997 effective date of AS 09.17.020(j) may constitutionally be limited by the terms of the statute; here, the claim is limited to one-half of any punitive damages award.[113] We stated in *Reust* that parties whose claims accrued after the effective date of the allocation statute cannot have a reasonable expectation of receiving more than half of their punitive damages award.[114]

Carpenter's claim accrued on July 24, 1998, nearly a year after AS 09.17.020(j) became effective. Her claim that the statute works an unconstitutional taking therefore fails.

### H. Pro Rata Attorney's Fees Should Be Deducted from the State's Fifty Percent Share of the Punitive Damages Award.

■ Carpenter's contingent fee agreement required her to pay forty percent of her punitive damages award to her attorney. The state argues that it was error for the superior court to deduct a pro rata share of Carpenter's contingent fee from its portion of the punitive damages award. The state argues that the language and legislative history of AS 09.17.020(j) and AS 09.60.080 support its position.[115] Alaska Statute 09.60.080 provides:

> If an attorney contracts for or collects a contingency fee in connection with an action for personal injury, death, or property damage and the damages awarded by a

court or jury include an award of punitive damages, the contingent fee due the attorney shall be calculated before that portion of punitive damages due to the state under AS 09.17.020(j) has been deducted from the total award of damages.

The state raises arguments similar to those it raised in *Anderson II*. In that case, we unanimously held that the statute requires that the superior court deduct pro rata the contingent fee from the state's portion of the punitive damages award.[116] Although section .080 only directly addresses how fees are to be "calculated," we construed the language of the section to "impl[y] that half of the calculated fee should be deducted from the portion of damages due the state."[117] We explained:

> Section .080 clearly is concerned with *when* the calculation of fees takes place, yet timing of the calculation is unimportant unless a deduction is meant to occur. Otherwise calculation of fees would be just as appropriate after the state's portion was deducted, so long as it was clear that the fees should be based on the entirety of the award. Further, if section .080 means that no deduction for fees can be taken from the state's share, its purpose would be to ensure full compensation of plaintiffs' attorneys while imposing a double burden on their clients. This seems like an unlikely objective.[118]

We determined that the statute's legislative history supported our interpretation.[119] An early version of the bill that became the Tort Reform Act of 1997 provided that "the contingent fee due the attorney shall be calculated after that portion of punitive dam-

provides that "[p]rivate property shall not be taken or damaged for public use without just compensation."

111. *Reust v. Alaska Petroleum Contractors, Inc.*, 127 P.3d 807, 823–24 (Alaska 2005).

112. *Id.* at 823.

113. *Id.*

114. *Id.*

115. We review the constitutionality of AS 09.17.020(j) and the proper interpretation of AS 09.60.080 de novo, adopting the rule of law that

is most persuasive in light of precedent, policy, and reason. *Anderson v. State ex rel. Cent. Bering Sea Fishermen's Ass'n (Anderson II)*, 78 P.3d 710, 713 (Alaska 2003).

116. *Anderson II*, 78 P.3d at 722.

117. *Id.* at 720.

118. *Id.* (footnote omitted, emphasis in original).

119. *Id.* at 720–22.

ages due the state under [AS 09.17.020(j) ] has been deducted from the total award of damages." [120] We concluded that a later amendment that changed the word "after" to "before" "was meant to require the state to pay its share of a plaintiff's attorney's contingent fee." [121]

The state also argues that the House of Representatives' rejection of a proposed amendment that would have allocated punitive damages to the state only after payment of all costs and fees incurred in obtaining the award supports its position. It points to House Majority Leader Brian Porter's statement that the amendment "was determined to be unacceptable in the main, because [its] punitive damages section ... removed the disincentive to settle found in returning a full 50% of these fines to the state." [122] We addressed that argument in *Anderson II*, explaining that it was more likely that the reference to " 'a full fifty percent of these fines' ... is to the fact that under the amendment the state would only receive a graduated percentage of punitive damages awards, up to forty percent for awards greater than $10 million, rather than fifty percent of any punitive damages award no matter what its size." [123] Because *Anderson II* squarely resolved the issue, we conclude that the superior court did not err by deducting a pro rata share of Carpenter's contingent fee from the state's portion of Carpenter's punitive damages award.

## I. Pro Rata Costs Incurred in Obtaining the Punitive Damages Award Should Be Deducted from the State's Fifty Percent Share.

The superior court declined to deduct a pro rata share of Carpenter's costs from the state's portion of her punitive damages award. Carpenter argues that the phrase "contingent fee" as used in AS 09.60.080 includes costs and expenses. The state challenges Carpenter's interpretation of the statute, pointing to a rejected amendment package to the bill that became the Tort Reform Act of 1997. The amendment explicitly required payment of both costs and fees before calculation of the state's share of the award. It provided: "All amounts to State, after payment of all costs and fees incurred in connection with securing the award." [124] The state argues that the deletion of any reference to costs in the final version of the bill implies that only fees are deducted from the state's share. [125] As *Anderson II* noted, however, the amendment package covered many subjects, [126] precluding us from inferring that the deletion indicates a legislative intention to prevent pro rata deduction of costs from the state's portion of punitive damages.

Because the statutory language is ambiguous, we apply equitable considerations to determine whether to apply a pro rata deduction of costs to the state's share of the

**120.** Sponsor Substitute for House Bill 58, § 34, 20th Leg., 1st Sess. (1997).

**121.** *Anderson II*, 78 P.3d at 721.

**122.** Memorandum from Rep. Brian Porter, House Majority Leader, to Senator Tim Kelly, Senate Rules Chairman (Apr. 16, 1997).

**123.** *Anderson II*, 78 P.3d at 721–22 (quoting Memorandum from Rep. Brian Porter, House Majority Leader, to Senator Tim Kelly, Senate Rules Chairman (Apr. 16, 1997)).

**124.** House Bill 58 Proposed Resolution Package, 20th Leg., 1st Sess. (1997).

**125.** The statutes of several of the states with split-recovery statutes specifically mention both costs and attorney's fees. *See, e.g.*, Iowa Code Ann. § 668A.1(2)(b) (West 2004) ("[A]fter payment of all applicable *costs and fees*, an amount not to exceed twenty-five percent of the punitive or exemplary damages awarded may be ordered paid to the claimant, with the remainder of the award to be ordered paid into a civil reparations trust fund administered by the state court administrator") (emphasis added); Mo. Ann. Stat. § 537.675(3) (West 2004) ("The state of Missouri shall have a lien for deposit into the tort victims' compensation fund to the extent of fifty percent of the punitive damage final judgment which shall attach in any such case after deducting attorney's *fees and expenses* ") (emphasis added); 2004 Utah Laws 164 ("In any case where punitive damages are awarded, the judgment shall provide that 50% of the amount of the punitive damages in excess of $20,000 shall, after an allowable deduction for the payment of attorneys' *fees and costs*, be remitted by the judgment debtor to the state treasurer for deposit into the General Fund") (emphasis added).

**126.** *Anderson II*, 78 P.3d at 721.

award.[127] If the state is not required to pay its pro rata share of the litigation costs, it effectively receives the windfall of a judgment in its favor without incurring any costs. In order to ensure that the state is not unjustly enriched at the expense of litigants, we read AS 09.60.080 to require a pro rata deduction of costs from the state's share of the punitive damages award.

The superior court found that it was unable to differentiate between Carpenter's costs attributable to her punitive damages award and those costs associated with her unsuccessful claims. If Carpenter prevails on her IIED claim on remand and additional punitive damages are awarded, the superior court may find it easier to make that determination. If not, the court should apply to Carpenter's total costs application a straight ratio of Carpenter's compensatory damages award to her punitive damages award.

### J. Whether the Superior Court Abused Its Discretion in Refusing To Deem Leykis a Prevailing Party Is Not Yet Determinable.

Under Alaska Rule of Civil Procedure 82(a), a prevailing party "shall be awarded attorney's fees." The superior court ordered the parties to bear their own costs and fees. Leykis appeals this order, arguing that because he was not found liable for any claim, he was a prevailing party and should receive a fee award. We need not decide this issue now, given the possibility Leykis will be found liable on remand for intentional infliction of emotional distress. If he is found liable, he will not be a prevailing party. If he is not found liable, the trial court should award attorney's fees to Leykis if it can distinguish the fees incurred in defending Leykis from those incurred in defending Westwood One.

### IV. CONCLUSION

For these reasons, we AFFIRM the grant of summary judgment dismissing Carpen-

ter's defamation and false light invasion of privacy claims. We also AFFIRM the evidentiary rulings and the ruling on Carpenter's proposed Jury Instruction No. 15. We REMAND Carpenter's IIED claim for a new trial. On remand, the jury must be instructed to consider whether Leykis's statements, when examined in their entirety, satisfy the elements of an IIED claim. The trial court should give other instructions to inform the jury how to distinguish between speech-based conduct that could be found to be sufficiently outrageous for IIED liability, and speech that is qualifiedly privileged but that might also be relevant to the IIED claim.

We AFFIRM the denial of Leykis's motion for a directed verdict on Carpenter's spoliation claim. We also AFFIRM the constitutionality of both the punitive damages award and AS 09.17.020(j), and AFFIRM the deduction of a pro rata share of Carpenter's attorney's fees from the state's portion of the punitive damages award, but REMAND for a pro rata reduction of costs from the state's portion of the award.

CARPENETI, J., concurring.

In arguing that the jury was misinstructed on her IIED claim, Karen Carpenter argues that Instruction No. 17 was erroneous because the superior court mistakenly assumed that Carpenter was a "public figure." I agree, and would resolve this issue on that basis.

Whether Instruction No. 17 was erroneous depends on whether Carpenter was a public figure. Relying in part on *Hustler Magazine, Inc. v. Falwell,*[1] the trial court instructed the jury to disregard statements of opinion and to apply the standard of liability applied to a defamation claim brought by a public figure. But if Carpenter is not a public figure, *Falwell,* which applied defamation standards to an IIED claim brought by

---

127. See *Alaska Native Tribal Health Consortium v. Settlement Funds Held for Or To Be Paid on Behalf of E.R. ex rel. Ridley,* 84 P.3d 418, 428–29 (Alaska 2004) (citing *Cooper v. Argonaut Ins.,* 556 P.2d 525 (Alaska 1976)).

1. 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

a public figure, does not control Carpenter's IIED claim.[2]

The Supreme Court has identified two bases on which to ground public figure status:

In some instances an individual may achieve such pervasive fame or notoriety that he becomes a public figure for all purposes and in all contexts. *More commonly, an individual voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues.*[3]

A person in this second category is often referred to as a "limited-purpose public figure."[4] To find public figure status on this basis, a court must conduct a two-part inquiry: first, whether there is a public controversy; and second, whether the nature and extent of the person's participation in the controversy were sufficient to make him or her a public figure within that controversy.[5] The superior court, pointing to Carpenter's contacts with government officials and KJNO advertisers, reasoned that Carpenter fit "within [the] definition of limited public figure, at least to the extent of her efforts to remove the Tom Leykis Show from the air." The dissent also takes this approach. Although the topic of whether the show should be canceled in Juneau arguably generated a public controversy,[6] I do not believe that Carpenter's participation was sufficient to confer limited-purpose public figure status on her.

Based on its analysis of the Supreme Court's precedents, the United States Court of Appeals for the Second Circuit has adopted the following test to determine whether a defendant has established that a plaintiff is a limited-purpose public figure:

A defendant must show the plaintiff has: (1) successfully invited public attention to his views in an effort to influence others prior to the incident that is the subject of litigation; (2) voluntarily injected himself into a public controversy related to the subject of the litigation; (3) assumed a position of prominence in the public controversy; and (4) maintained regular and continuing access to the media.[7]

I believe that this test appropriately states what a defendant must prove, and that it accurately reflects the Supreme Court's analysis in this area. I would adopt it here.

I assume that Carpenter "voluntarily injected" herself into the topic of whether the show should be aired in Juneau, although there is little evidence that this question was "public" before July 24. KJNO had already received some complaints and some advertisers had already cancelled, but its manager regarded the station's decision whether to stop broadcasting the show as a "private thing."

Therefore, I have doubts that there was a "public controversy." Assuming, however, that Leykis satisfied the second element, inquiry on whether Leykis established that Carpenter's conduct satisfied the test's first, third, and fourth elements leads to the conclusion that she was not a public figure.

Carpenter testified that after hearing the Tom Leykis Show for the first time on July

2. Whether Carpenter is a public figure is a question of law that we decide *de novo*. *Mount Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 835 (Alaska 1995) (citations omitted).

3. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (emphasis added).

4. *See, e.g., Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 246 n. 3, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

5. *See, e.g., Carr v. Forbes, Inc.*, 259 F.3d 273, 278 (4th Cir.2001).

6. In *Mount Juneau Enterprises* we explained that "[a] public controversy is not simply a matter of interest to the public, but rather 'a real dispute,

the outcome of which affects the general public or some segment of it in an appreciable way.' " 891 P.2d at 836 (quoting *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1296 (D.C.Cir. 1980)); *see also Time, Inc. v. Firestone*, 424 U.S. 448, 454, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976).

7. *Lerman v. Flynt Distrib. Co.*, 745 F.2d 123, 136–37 (2d Cir.1984) (relying on *Gertz*, 418 U.S. at 351–52, 94 S.Ct. 2997; *Time, Inc.*, 424 U.S. at 454–55, 96 S.Ct. 958; *Wolston v. Reader's Digest Ass'n*, 443 U.S. 157, 166, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979); *Hutchinson v. Proxmire*, 443 U.S. 111, 135–36, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979)).

20, she discussed the program with about five friends and associates. She contacted a woman named Lorene Kappler who was trying to get the Tom Leykis show taken off the air and asked Kappler what she could do to help. Kappler said she would send a letter to KJNO and asked Carpenter to do so as well. They also discussed several other ideas during what Kappler estimated to be a half-dozen telephone conversations. Carpenter never actually met Kappler.

The next day, July 21, Carpenter left messages for three City and Borough of Juneau assembly members. Two members never returned her calls; she actually spoke to only one. Carpenter related her concerns to that member, inquired whether Juneau had any decency ordinances, and asked for advice on how to handle the situation. That member checked with the city attorney and then informed Carpenter that Juneau had no decency ordinances; she suggested that Carpenter contact the radio station's advertisers.

Carpenter also called the governor's office on July 21, but testified that she "wasn't specific about what [she] wanted when [she] called them." She recalled that she was simply "trying to see if there were any decency laws regarding broadcasting." She received no response. Carpenter also contacted the congressional office in Juneau in an attempt to gather information about any federal decency laws, but apparently did not request assistance in getting the show taken off the air.

Carpenter testified that on July 22 she contacted "three or four" advertisers and asked them if they knew their ads were being run during the Tom Leykis Show and whether they wanted their advertising dollars to support the content of the show. On

the same day she also faxed her complaint letter to KJNO. Carpenter testified that she was unaware that, as required by federal regulations, the letter would be placed in the station's "public file." [8] She did not write directly to Westwood One or the Tom Leykis Show and did not intend her letter to be forwarded; she thought "it was a local issue."

Carpenter testified that she did nothing related to The Tom Leykis Show on July 23.

KJNO's last broadcast of the program was on July 24.

Carpenter testified that she probably spent a total of six hours on the issue, and spent most of that time talking with Kappler. The KJNO station manager agreed at his deposition, in a passage read at trial, that nothing in Carpenter's letter to the station indicated to him she was a public person rather than a private person expressing her personal point of view.

Before the July 24 broadcast, Carpenter did not write letters about the show to the editor of the local newspaper. She did not appear on television or radio. She did not organize or attend community meetings on the subject. She did not picket the station. In other words, Carpenter did not do any of the things that courts in other jurisdictions have found significant in concluding that a plaintiff invited the public's attention to his or her views. [9] Aside from discussions with Kappler, friends, and associates, and a handful of telephone calls to local, state, and federal governmental offices, there was no evidence that Carpenter communicated with anyone other than private individuals specifically associated with airing the Tom Leykis Show on KJNO (i.e., some advertisers and

---

8. 47 Code of Federal Regulations (C.F.R.) 73.1202 (2004) provides that

All written comments and suggestions received from the public by licensees of commercial AM, FM, TV and Class A TV broadcast stations regarding operation of their station shall be maintained in the local public inspection file, unless the letter writer has requested that the letter not be made public or when the licensee feels that it should be excluded from the public inspection file because of the nature of its content, such as a defamatory or obscene letter.

9. *See, e.g., Chevalier v. Animal Rehab. Ctr., Inc.,* 839 F.Supp. 1224, 1234 (N.D.Tex.1993) (plaintiff appeared on television, gave interviews to magazines, and "apparently tried to orchestrate a counter-letter-writing campaign"); *Samuels v. Berger,* 191 A.D.2d 627, 595 N.Y.S.2d 231, 233 (N.Y.App.Div.1993) (plaintiff took out newspaper advertisements, purchased advertising time on local radio, spoke at public hearings, and wrote letter to editor).

the station itself).[10] On these facts, I would conclude that Carpenter did not "invite[ ] public attention" to her views.

I also conclude that the evidence did not establish that Carpenter "assumed a position of prominence" through her participation in the controversy. Steve Rhyner, the manager of KJNO, testified that Carpenter was not the only listener who complained. He testified that major advertisers were cancelling from the show before Carpenter became involved. "[T]he straw that broke the camel's back," according to Rhyner, was one particular Leykis show that Rhyner did not "care for personally." Rhyner then made the final decision to cancel the show. Carpenter was therefore one of several people concerned about the content of the show and there was nothing especially noteworthy about her participation.[11]

Finally, there is no evidence that Carpenter had or exercised *any* access to the media, much less "regular and continuing access." The fact that Leykis read Carpenter's letter on the air during the July 24 broadcast does

not change my conclusion, because "those charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure." [12]

Because Carpenter did not "engage the public's attention" and did not "assume special prominence in the resolution" of the controversy over the Tom Leykis Show, I would hold that she was not a public figure.[13]

As a private figure, Carpenter is entitled to greater protection from hurtful speech.[14] In *Gertz*, the Supreme Court, addressing a defamation claim brought by a private figure, explained:

> Public officials and public figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements th[a]n private individuals normally enjoy. Private individuals are therefore more vulnerable to injury, and the state interest in protecting them is correspondingly greater.[15]

10. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 352, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (holding that lawyer who attended coroner's inquest and filed action for damages did not "engage the public's attention" because he "never discussed either the criminal or civil litigation with the press and was never quoted as having done so").

11. *See Bell v. Nat'l Republican Cong. Comm.*, 187 F.Supp.2d 605, 609, 612 (S.D.W.Va.2002) (holding that campaign volunteer who had expressed support for one of candidate's political positions in television advertisement and who also posed for photographs with candidate did not become limited-purpose public figure because his actions were not sufficiently "significant" and because he did not assume "a position that ... propel[led] him to the forefront of the campaign") (quoting *Suriano v. Gaughan*, 198 W.Va. 339, 480 S.E.2d 548, 557 (1996) (internal quotations omitted)); *Nehls v. Hillsdale College*, 178 F.Supp.2d 771, 778 (E.D.Mich.2001) (holding that expelled student, whose role in controversy merited only "short blurb in a nine page [magazine] article," did not assume position of prominence).

12. *Hutchinson*, 443 U.S. at 135, 99 S.Ct. 2675 (citing *Wolston*, 443 U.S. at 167–68, 99 S.Ct. 2701).

13. *Gertz*, 418 U.S. at 351–52, 94 S.Ct. 2997.

Our previous cases concluding that a person had become a limited-purpose public figure all

involved situations in which the person made public expressions of opinion or sought public approval. *See Mount Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 835 (Alaska 1995) (holding that tramway project developer who voluntarily sought public approval of project was public figure); *Beard v. Baum*, 796 P.2d 1344, 1353 (Alaska 1990) (holding that former state transportation department employee who brought allegations of departmental corruption to public attention was public figure); *Rybachek v. Sutton*, 761 P.2d 1013, 1014 (Alaska 1988) (holding that newspaper columnist on natural resource and mining issues injected herself into public controversy on those issues); *Moffatt v. Brown*, 751 P.2d 939, 941 (Alaska 1988) (holding that candidate for state medical board voluntarily placed herself in position of public attention given strong public interest in board appointee's qualifications).

14. Despite the error of concluding that Carpenter was a limited-purpose public figure, it was not error to grant summary judgment against Carpenter on her defamation and false light publicity claims. Statements that do not reasonably imply false facts—even those targeted at private figures—are not susceptible to defamation and false light liability. *Gertz*, 418 U.S. at 339, 341, 94 S.Ct. 2997; *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C.Cir.1990).

15. *Gertz*, 418 U.S. at 344, 94 S.Ct. 2997 (footnote omitted).

The Court also reasoned that private figures deserve protection more than public figures because the private individual has not voluntarily become involved in a public controversy; he has not intentionally exposed himself to increased risk of injury.[16] Where private figures are concerned, a different balance is struck between First Amendment concerns and the state's interest in allowing individuals to seek compensation for injury to reputation.[17] In such cases, the state has a "strong and legitimate" interest in protecting private individuals.[18] This interest, and the justifications for distinguishing between defamation claims brought by private and public figures, apply with equal force to IIED claims involving speech.

In *Hustler Magazine, Inc. v. Falwell,* the Supreme Court applied defamation standards to an IIED claim brought by a public figure.[19] The Court held that the First Amendment limits an IIED action involving speech directed toward a public figure to the same extent that it would limit a defamation action based on the same speech.[20] That is, speech that is protected for purposes of a defamation claim because it is opinion, or because it is a true statement of fact, or because it was false but made without actual malice, may not serve as the basis for an IIED claim brought by a public figure. *Falwell* by its terms governs only public figure cases.[21] Because I believe that the state's interest in protecting private individuals from the intentional infliction of emotional distress outweighs the First Amendment interest in speech on private matters concerning private individuals, I would decline to extend *Falwell* to IIED claims brought by private figures such as Carpenter.

The state has a "strong and legitimate" interest in protecting private individuals from unprovoked verbal attacks. Private figures like Carpenter are both less equipped to defend themselves against attack and more worthy of protection than are public figures who run the risk of closer public scrutiny, but "enjoy significantly greater access to the channels of effective communication."[22] Although Carpenter voluntarily participated in the controversy over the show's cancellation, the limited and discrete nature of her participation did not warrant the degree of exposure she received.

Application of defamation standards to the IIED claims of private figures exposes to retaliation any private individual exercising her own free speech rights to complain about media program content. In such circumstances, no one could ever safely complain about the media without risking public attack. It would chill listeners' desire to voice their opinions. This result is inconsistent with the value placed on listener input by the FCC regulations as well as the values represented by the First Amendment.[23]

Finally, the statements that allegedly inflicted emotional distress on Carpenter were not fairly a part of any public issue. Neither Carpenter's sex life nor her contact information was a matter of widespread public interest. Leykis's remarks generally constituted personal insults and jabs at Carpenter's alleged sexual proclivities; they were not the sort of speech that encourages "the free and robust debate of public issues."[24] Protection of personal insults or offensive parodies targeted at public figures is necessary to ensure uninhibited public debate.[25] But protection of insults and threats directed at private figures is not necessary to give adequate

16. *Id.* at 345, 94 S.Ct. 2997.

17. *Id.* at 343, 94 S.Ct. 2997.

18. *Id.* at 348, 94 S.Ct. 2997.

19. 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

20. *Id.* at 56, 108 S.Ct. 876.

21. *Id.* at 50, 108 S.Ct. 876.

22. *Gertz,* 418 U.S. at 344, 94 S.Ct. 2997.

23. *See* FCC Broadcast Radio Services, 47 C.F.R. § 73.1202 (2004) (requiring licensees of commercial AM, FM, TV, and Class A TV broadcast stations to maintain all written comments and suggestions regarding operation of station in local public inspection file).

24. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.,* 472 U.S. 749, 760, 105 S.Ct. 2939, 86 L.Ed.2d 593 (1985).

25. *See Falwell,* 485 U.S. at 52, 108 S.Ct. 876.

"breathing space" [26] to the freedoms protected by the First Amendment.

For these reasons, I would conclude that Instruction No. 17 misstated the applicable law. I would remand for retrial of the IIED issue without affording Leykis the protection of the ruling that Carpenter is a public figure.

BRYNER, Chief Justice, with whom CARPENETI, Justice, joins, dissenting in part.

For the reasons set out in my dissenting opinion in *Evans ex rel. Kutch v. State*,[1] I disagree with the parts of today's opinion that uphold the constitutionality of Alaska's non-economic damages cap and punitive-damages forfeiture provisions. In all other respects I agree with and join in the opinion.

FABE, Justice, dissenting.

## I. Introduction

I cannot agree with the court's conclusion that Leykis's statements, uttered during a national broadcast and discussing a public figure and a public issue, are unprotected speech. Because I disagree with the court's conclusion that the statements Leykis made during his broadcast are not protected speech, I conclude that the trial court's instructions did not prevent the jury from fully considering Carpenter's intentional infliction of emotional distress claim.

In my view, the record does not support the court's conclusion—based largely on seven words—that Leykis issued a "call to arms" inviting listeners to harass Carpenter. Even a cursory examination of the statements within the context of the broadcast reveals that the "call to arms" was nothing more than the sort of hyperbole and rhetoric that is typical of debate about public figures and matters of public concern in this day and age.

Moreover, the trial court recognized the controlling precedent for such statements—the United States Supreme Court's holding in *Hustler Magazine, Inc. v. Falwell* that public figures may not recover for IIED without proving false statements of fact made with actual malice [1]—and properly instructed the jury that Carpenter could not recover from Leykis unless the statements were unprotected for another reason.[2] Yet, without upsetting the trial court's finding that Carpenter was a public figure,[3] the court today concludes that Leykis may be subject to liability for intentional infliction of emotional distress for statements directed at Carpenter during a heated discussion of an issue at the heart of First Amendment protections. Where, as here, an IIED claim is based on speech directed at a public figure and on a matter of public concern, declining to limit IIED liability threatens to erode the breathing space that robust political dialogue requires.

## II. Leykis Did Not Issue a "Call to Arms."

I disagree with the factual conclusions upon which the court's opinion rests. I do

---

**26.** *New York Times Co. v. Sullivan*, 376 U.S. 254, 272, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quoting *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)).

**1.** 56 P.3d 1046, 1075–76 (Alaska 2002).

**1.** 485 U.S. 46, 56, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

**2.** The court today does not contend that the trial court failed to properly instruct the jury on incitement or true threats.

**3.** The concurrence argues that Carpenter was not a limited purpose public figure, reasoning that her participation in the attempt to remove the Tom Leykis Show from the air was insufficient "to confer limited-purpose public figure status on her." Concurrence at 71. I believe the trial court correctly decided that Carpenter was a

limited purpose public figure because she "voluntarily injected ... herself into the controversy" regarding whether the Tom Leykis Show should remain on the airwaves by "purposely trying to influence the outcome." *Mount Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 836 (Alaska 1995) (internal quotations omitted); *see also Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 351, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (a limited purpose public figure is one who "voluntarily injects himself ... into a particular public controversy"); *Waldbaum v. Fairchild Publ'ns, Inc.*, 627 F.2d 1287, 1292 (D.C.Cir.1980) ("a person has become a public figure for limited purposes if he is attempting to have, or realistically can be expected to have, a major impact on the resolution of a specific public dispute that has foreseeable and substantial ramifications for persons beyond its immediate participants").

not agree that the record supports the conclusion that Leykis issued a "call to arms" intended to provoke listeners to harass Carpenter or the conclusion that Leykis's words were devoid of any attempt to persuade.[4] Examination of Leykis's statements within the overall context of the broadcast reveals that the statements at issue focused directly on the issue of public concern—namely, the show's cancellation. To the extent that his statements encouraged listeners to do anything, it was to persuade Carpenter, a public figure, to change her mind by demonstrating that she held the minority view and by suggesting alternate routes to address her concerns.

The court does not sufficiently identify and analyze the basis for its conclusion that Leykis issued a "call to arms." Unable to point to any statements made by Leykis that overtly encouraged listeners to harass Carpenter, the court patches together two exchanges separated by over an hour in the broadcast. The alleged "call to arms" apparently began when a male caller reported Carpenter's phone number, which was partially blocked out, and her fax number. The caller stated simply that "I think everybody should give her a little piece of . . . our minds." Leykis responded to the caller not with an exhortation that listeners use the number to harass Carpenter, but with a statement about censorship:

> Well, you know, again here's one person trying to decide for an entire city what you ought to be able to listen to. And, you know, again, you have an off button; you have a station changer button, a tuner. You can get away from the show if you don't want to hear it. But, no, it's not that she doesn't want to hear it. She doesn't want you to hear it.

After further exchange and another statement by Leykis that "it's a shame when the minority can decide what the majority are going to hear," the *caller* repeated his hope

that people would call Carpenter and send her faxes. Leykis responded not by agreeing or suggesting that listeners should harass Carpenter, but by suggesting that the listener "might also contact that fine church in your community that got together to try to do us in." In so doing, Leykis redirected the listener's focus to other proponents of the show's cancellation.[5]

Leykis's response to the caller's publication of Carpenter's numbers did not include any suggestion that listeners harass Carpenter or make her life a living hell. Indeed, Leykis himself did not directly urge listeners to contact Carpenter for any reason whatsoever. He made no statement to Carpenter that she should expect such treatment. Instead, his speech was directed at the issue of public concern—the cancellation of his show due to what he perceived to be a minority's wishes. Even if Leykis's exchange with the listener could be reasonably construed as actively endorsing some sort of contact with Carpenter, his statements about censorship and contacting other censors suggest he intended to foster political debate rather than encourage personal harassment. Such an exchange is no less protected than a radio show's broadcast of a politician's publicly listed fax number, with an exhortation that listeners contact the politician to express their views on an issue of public concern.

In recognition that the broadcast of Carpenter's fax number alone is not sufficient, the court also relies on a statement by Leykis that appears to have occurred over an hour after the caller reported Carpenter's fax number. In this second statement, Leykis said to a female caller from Juneau: "Well, we hate to lose you, but like I say, stay tuned, 'cause we're going to get back on in Juneau." He later continued: "And we're going to make that woman's life a living

---

4. Majority at 58.

5. Other statements in the broadcast confirm that Leykis's intent extended no further than to encourage debate and petitions. For example, he stated early in the broadcast that "I'm going to find out who these people are, and we'll put it up on the web site." When the caller replied: "That would be just wonderful," Leykis continued: "And we're—we're going to find out who buckled to the pressure in terms of these advertisers. We're going to find out, and we're going to let you know who they are. And then you can write your own letters."

hell." [6] If Leykis intended this statement to encourage listeners to send harassing faxes to Carpenter, common sense suggests that he would have repeated the fax number instead of assuming that listeners had written down the contact information over an hour earlier. But Leykis did not repeat Carpenter's fax number. He did not propose that listeners make Carpenter's life hell by contacting her, nor did he make statements encouraging them to harass Carpenter. Read fairly and in context, the statement merely reflects Leykis's intent to get back on the air in Juneau and his opinion and commentary that, in so doing, he would make Carpenter's life miserable.

The notion that Leykis exhorted viewers to harass Carpenter is further undermined by the reaction of listeners. Contrary to the onslaught of harassing faxes that one might expect if Leykis incited his national audience to make Carpenter's life a living hell, Carpenter testified that she received one phone message [7] and several faxes. Carpenter testified that the faxes "were dealing with the show being taken off the air." Indeed, the faxes submitted as exhibits focused on the discontinuation of the show's broadcast.[8] While listeners' actions in response to the broadcast do not conclusively prove the reasonable interpretation of Leykis's comments, the faxes support a conclusion that Leykis did not encourage listeners to harass Carpenter and that listeners did not interpret his statements that way. Moreover, even if he did encourage listeners to contact Carpenter about the issue of public concern—the show's cancellation—his actions fall far short of a "call to arms" exhorting listeners to violate the law to harass Carpenter. In sum, this patchwork of statements cited by the court as supporting a "call to arms" represents nothing more than rhetoric addressing a public figure and an issue of public concern.

The record demonstrates the fallibility of the court's presumption that we can meaningfully distinguish between statements intended to contribute to debate and those intended to harass. It is precisely because of the danger of courts attempting to draw such fine lines that this court and the United States Supreme Court have extended protection to speech directed at public figures and matters of public concern.

### III. The First Amendment Protects Leykis's Statements.

The court's opinion today is wholly inconsistent with the United States Supreme Court's holding in *Hustler Magazine, Inc. v. Falwell* that public figures may not recover on claims of IIED without a showing of false statements of fact made with actual malice.[9]

As the court construes it, Carpenter's IIED claim is not based on any statement of fact, false or otherwise. Instead, while conceding that Leykis did not make statements that constitute incitement,[10] the court concludes that his statements "provoking his listeners and inviting them ... to harass Carpenter" can be the basis for liability.[11] This conclusion violates both the holding and the rationale of *Falwell*.

In *Falwell*, the Supreme Court noted that "in the world of debate about public affairs, many things done with motives that are less than admirable are protected by the First

---

6. This echoes Leykis's earlier comment that "[y]ou can't stop this show. Oh, you can stop Juneau, Alaska. But you can't stop me. And I'm on the Internet baby.... And it doesn't matter; you can take me off the air. It will not matter. Juneau, Alaska will still get this show ... one way or the other."

7. In addition to one phone message, Carpenter testified that she received hang-up calls and spoke with one person who called her a jerk before she hung up.

8. One argued that "[n]o one has the right to dictate to me or to anyone else what I have the right to listen to.... That's what they make off buttons for." Another echoed this thought, suggesting that the on-off knob is the appropriate avenue for dealing with media one finds to be distasteful. A third fax stated: "Hey You Know What Thanks to You Tom Leykis Has Been Cancelled." It appears that a second page of this fax also stated: "You are a jerk! P.S. Sit on it!"

9. 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988).

10. Majority at 60.

11. Majority at 57.

Amendment."[12] The Court reasoned that "while ... a bad motive may be deemed controlling for purposes of tort liability in other areas of the law, we think the First Amendment prohibits such a result in the area of public debate about public figures."[13] As a result, the Supreme Court held that public figures cannot recover for IIED without showing a false statement of fact made with malice.[14]

As the Supreme Court noted in *Falwell,* "[a]t the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern."[15] The Supreme Court went on to explain the importance of protecting speech critical of public figures:

> We have therefore been particularly vigilant to ensure that individual expressions of ideas remain free from governmentally imposed sanctions. The First Amendment recognizes no such thing as a "false" idea....
>
> The sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical of those who hold public office or those public figures who are intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.... Such criticism, inevitably, will not always be reasoned or moderate; public figures as well as public officials will be subject to vehement, caustic, and sometimes unpleasantly sharp attacks.[16]

As explained above, Carpenter, a public figure, bases her IIED claim on rhetoric spoken by Leykis during his discussions of Carpenter's efforts to have his show cancelled. *Falwell* makes clear that such opinion statements cannot be the basis for an IIED claim.

To find error in the trial court's instruction, the court attempts to limit *Falwell* today on two different grounds. First, without citing any authority from any court, the court appears to limit *Falwell* by reading its constitutional protections as inapplicable to statements that are neither true nor false.[17] However, this reading cannot be correct. *Falwell* is clearly intended to protect opinion statements about public figures and matters of public concern. And the very definition of an opinion statement is that its accuracy cannot be established. By attempting to distinguish this case on the grounds that Leykis's statement can be neither true nor false, the court exposes all opinion statements directed at public figures to IIED liability. This is not only clearly contrary to *Falwell* but substantially eviscerates the protections it extended.

The court also tries to limit *Falwell* by declaring that its protection applies only to speech *about* public figures.[18] But the First Amendment's robust protections for debate in the public realm simply cannot turn on such an amorphous distinction. Moreover, I cannot conclude that the statements at issue—made during a national broadcast— were not about Carpenter. Indeed, Leykis's statement that his return to the air would make Carpenter's life a living hell is undeniably about Carpenter and her reaction to his show. The concern that animated the Court's holding in *Falwell*—the need to protect heated rhetoric directed at public figures and issues of public concern—applies regardless of how a plaintiff chooses to package her claim and regardless of whether a statement is about a public figure or to a public figure.[19]

---

12. 485 U.S. at 53, 108 S.Ct. 876.

13. *Id.*

14. *Id.* at 56, 108 S.Ct. 876.

15. *Id.* at 50, 108 S.Ct. 876.

16. *Id.* at 51, 108 S.Ct. 876 (internal quotations and citations omitted).

17. Majority at 56–57.

18. Majority at 56–57.

19. I do not contest the court's suggestion that, were the statements unprotected for another established reason—such as true threat of incitement to illegal activity—Leykis would be liable even without a showing of false facts stated with actual malice. Majority at 56 n. 44. However, unless the speech is unprotected for another reason—a conclusion the court does not reach—an IIED claim by a public figure cannot succeed without meeting the heightened standards of *Falwell.*

Here, Leykis's words, on a matter of public concern and regarding a public figure, reflect his opinions and his attempts to persuade his audience of an injustice. Certainly Leykis's remarks about Carpenter were crass, mean, and utterly repugnant. And they could be construed as endorsing listener contact with Carpenter to express outrage that her actions had caused his show to be cancelled in Juneau. But such incitement to action, petition, or protest on matters of public concern and directed at public figures lies at the core of the sort of speech protected by *Falwell*.[20]

Statements of opinion on matters of public concern are often characterized by hyperbole or "very crude offensive method[s] of stating a political opposition."[21] And there is no doubt that Leykis's remarks about Carpenter had an ugly, sexist tone. Nonetheless, because political debate is the core of First Amendment protection, the United States Supreme Court has evinced a strong commitment to ensuring that political hyperbole and emotionally charged rhetoric can be expressed without fear of liability or sanction. Time and again, the Supreme Court has protected such speech. For example, in *Watts v. United States*, the United States Supreme Court overturned Watts's conviction under a statute prohibiting threats to the President of the United States.[22] During a public rally, Watts had stated that he did not intend to report for the draft and that "[i]f they ever make me carry a rifle the first man I want to get in my sights is L.B.J."[23] The Court upheld the statute, but overturned Watts's conviction, cautioning that the "kind of political hyperbole indulged in" by Watts was not a threat.[24] Noting that the political arena "is

often vituperative, abusive, and inexact," the Court reasoned that Watts's only offense was "a kind of very crude offensive method of stating a political opposition."[25]

Similarly, in *NAACP v. Claiborne Hardware Co.*, the United States Supreme Court overturned a judgment holding the Field Secretary of the NAACP liable for the economic consequences of a boycott of white businesses.[26] The state court partially based its finding of liability on a speech which included a statement that "[i]f we catch any of you going in any of them racist stores, we're gonna break your damn neck."[27] The Supreme Court acknowledged that "[i]n the passionate atmosphere in which the speeches were delivered, they might have been understood as inviting an unlawful form of discipline or, at least, as intending to create a fear of violence."[28] Nonetheless, the Court held that the speech was protected, reasoning that "[a]n advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause. When such appeals do not incite lawless action, they must be regarded as protected speech."[29]

Despite this command that speech on matters of public concern be given great latitude, the court decides this case without citing any explicit statement by Leykis encouraging listeners to illegally harass Carpenter. Instead, the court reads between the lines of several statements of opinion addressing a public figure and a matter of public concern. In so doing, the court violates the principle that claims involving such statements should be read against the "background of a pro-

---

**20.** Because the court assumes Carpenter is a public figure and the cancellation of the show a matter of public concern, the New York court's decision in *Esposito–Hilder v. SFX Broadcasting, Inc.*, is inapposite. In *Esposito–Hilder*, that court upheld a ruling that an employee at a radio station had a claim for IIED based on a competing radio station's broadcast of derogatory comments about her wedding photo. 236 A.D.2d 186, 665 N.Y.S.2d 697, 700–01 (1997). Unlike Carpenter, the plaintiff in *Esposito–Hilder* was a private figure; her wedding photo was not a matter of public concern. *Falwell* did not apply.

**21.** *Watts v. United States*, 394 U.S. 705, 708, 89 S.Ct. 1399, 22 L.Ed.2d 664 (1969).

**22.** *Id.*

**23.** *Id.* at 706.

**24.** *Id.* at 707–08.

**25.** *Id.* at 708.

**26.** 458 U.S. 886, 926, 102 S.Ct. 3409, 73 L.Ed.2d 1215 (1982).

**27.** *Id.* at 902, 102 S.Ct. 3409.

**28.** *Id.* at 927, 102 S.Ct. 3409.

**29.** *Id.* at 928, 102 S.Ct. 3409.

found national commitment to the principle that debate on public issues should be uninhibited, robust, and wideopen, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." [30]

It is this commitment to robust debate that led the United States Supreme Court to create heightened standards for IIED claims by public figures in *Falwell.* Yet the court today sees fit to rely solely on the elements of IIED to protect speech directed at public figures—elements the Supreme Court specifically declared inadequate in *Falwell.* The United States Supreme Court explicitly rejected the notion that the requirement of outrageousness sufficiently protects speech on matters of public concern, reasoning in *Falwell:*

> "Outrageousness" in the area of political and social discourse has an inherent subjectiveness about it which would allow a jury to impose liability on the basis of the jurors' tastes or views, or perhaps on the basis of their dislike of a particular expression. An "outrageousness" standard thus runs afoul of our longstanding refusal to allow damages to be awarded because the speech in question may have an adverse emotional impact on the audience. [31]

The subjective nature of outrageousness, particularly when applied to rhetoric, eviscerates the protection for speech on matters of public concern or directed at public figures. Because liability under a subjective test is unpredictable, it threatens to curb the use of such persuasive tools as rhetoric and hyperbole in political speech. It is this premise that the United States Supreme Court recognized in *Falwell,* and it is this premise that creates the need to establish heightened standards for IIED claims by public figures.

In stark contrast to the heightened standards the Supreme Court deemed necessary in *Falwell,* the court today concludes that the

trial court erred by failing to instruct the jury that a public figure may recover for IIED based on speech that is "intended to harass" [32] or that is intended to "harass by provoking a widespread audience to react with hostility." [33] In so doing, the court creates a new category of unprotected speech directed at public figures—a new category whose precise boundaries it does not define.

Unlike the Supreme Court's conscious efforts to carefully circumscribe liability and protect public debate in *Falwell, Watts,* and *Claiborne,* today's opinion creates a broad and unbounded new category of unprotected speech directed at public figures. The court does not clarify how one can determine when speech is *about* a public figure, nor does it define "harass" or explain how one can distinguish between opinions that harass and those that do not. Then, despite recognizing "the difficulty of drawing the line accurately," the court expresses confidence in the jury's ability to do so. In my view, such confidence is unwarranted. In the area of the First Amendment, this vagueness is particularly pernicious. In short, the First Amendment demands more.

Today's holding threatens to further chill speech because of the court's conclusion that the jury may consider Leykis's derogatory comments—even those that the opinion concedes are protected speech—in evaluating Carpenter's IIED claim. [34] Protected speech can not serve as the basis for liability, regardless of whether that speech serves as the sole basis for liability or is considered as one factor by the jury. The purpose of protecting speech is to avoid unnecessarily chilling public debate and dialogue. As the United States Supreme Court recognized in *New York Times v. Sullivan,* speakers fearing potential liability for their statements will "tend to make only statements which 'steer far wider of the unlawful zone.' " [35] Coupled with the fear of liability for opinion statements, the knowledge that even protected

---

30. *Watts,* 394 U.S. at 708, 89 S.Ct. 1399 (internal quotations & citation omitted).

31. *Falwell,* 485 U.S. at 55, 108 S.Ct. at 882.

32. Majority at 59.

33. Majority at 62.

34. Majority at 61–62.

35. 376 U.S. 254, 279, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (quoting *Speiser v. Randall,* 357 U.S. 513, 526, 78 S.Ct. 1332, 2 L.Ed.2d 1460 (1958)).

speech could be considered by a jury will chill discussion of matters of public concern. Allowing the jury to consider protected speech wholly undermines any protection ostensibly granted that speech.

Moreover, the court advances a startlingly low threshold for testing whether Leykis's speech can be penalized, suggesting in its discussion of jury instructions that "it is enough that a reasonable person could think that his comments were likely to prompt listeners to *contact* or *communicate* with Carpenter in a hostile fashion." [36] But encouraging others to contact or communicate with a public figure, even in a hostile fashion, lies at the heart of public debate and the democratic system itself. For example, under this holding, liability could even be imposed on a broadcast that encouraged listeners to call a town mayor and express their views on an issue such as taxation if listeners were encouraged to insult the mayor. Such liability erodes the breathing space for matters of public concern that the United States Supreme Court has vigilantly guarded.

The court turns to analogy to justify its holding. To support its conclusion that Leykis's speech is unprotected, the court analogizes to decisions upholding ordinances banning residential picketing.[37] The court cites *Frisby v. Schultz*[38] for the proposition that the home is given special solicitude. In *Frisby,* the United States Supreme Court upheld a content-neutral ordinance which prohibited only "focused picketing taking place in front of a particular residence." [39] The Court emphasized that protestors were not banned from residential neighborhoods and remained free to go door-to-door, to distribute literature, and to contact residents by phone.[40] But upholding a content-neutral ordinance banning a narrow type of picketing is a far cry from penalizing rhetoric because

it may have encouraged listeners to contact a public figure about a matter of public concern. As a result, *Frisby* simply does not support a conclusion that Leykis incited unlawful conduct on the part of his listeners. Even if he encouraged listeners to blanket Carpenter with objections to the show's cancellation, Leykis's speech is protected communication.

Similarly, *United States v. Popa,*[41] relied on by the court today,[42] demonstrates the constitutionally important difference between unprotected harassment and rhetoric on a matter of public concern. In *Popa,* the D.C. Circuit vacated the conviction of a defendant who had been prosecuted under a statute making it a crime to make telephone calls "without disclosing [one's] identity and with intent to annoy, abuse, threaten, or harass any person." [43] The defendant had made seven phone calls to the United States Attorney for the District of Columbia, including two recorded calls in which he referred to the United States Attorney as a "criminal" and a "whore," who "violated ... our rights." [44] Noting that the defendant testified that he had called to complain about having been assaulted by police officers and the prosecutor's conduct, the court reasoned that the statute was unconstitutional as applied because "[p]unishment of those who use the telephone to communicate a political message" did not further the government's interest in "protecting individuals from non-communicative uses of the telephone." [45] Similarly, the First Amendment would likely protect a listener who directly contacted Carpenter to express a view. And, as detailed earlier, Leykis did not encourage listeners to illegally harass Carpenter by phone or by fax. At most, he encouraged them to express their opinions and petition on behalf of the show. As the D.C. Circuit concluded in

---

36. Majority at 62 (emphasis added).

37. Majority at 60.

38. 487 U.S. 474, 108 S.Ct. 2495, 101 L.Ed.2d 420 (1988).

39. *Id.* at 483, 108 S.Ct. 2495.

40. *Id.* at 483–84, 108 S.Ct. 2495.

41. 187 F.3d 672 (D.C.Cir.1999).

42. Majority at 61.

43. 187 F.3d at 674 (quoting 47 U.S.C. § 223(a)(1)(C)).

44. *Id.* at 673.

45. *Id.* at 677 (internal quotations omitted).

*Popa*, such political communication with a public figure on a matter of public concern is protected speech.

Moreover, the court's analogy to telephonic harassment overlooks the fundamental distinction between prohibiting harassing calls and punishing speech that encouraged others to make telephone calls. The court does not base its holding on any conduct by Leykis; he did not telephone or fax Carpenter. Instead, the court's holding is based on a conclusion that Leykis's words could be construed to exhort others to telephone or fax Carpenter. Despite the obvious echoes of incitement that permeate this line of reasoning, the court makes no argument that Leykis's actions rose to the level of incitement or that there was any error in the jury's instruction on incitement.

Today the court overlooks over forty years of United States Supreme Court precedent dedicated to ensuring adequate breathing space for speech about public figures and matters of public concern. It directly contravenes the United States Supreme Court's command that claims of IIED brought by public figures must meet the heightened standards of proving false facts and actual malice.

## IV. The *Mount Juneau* Privilege for Matters of Public Concern Protects Leykis's Statements.

The court's opinion is also wholly inconsistent with this court's longstanding policy of protecting speech on matters of public interest and concern through application of the actual malice standard. Even if Carpenter were not a public figure, the *Mount Juneau* privilege protects Leykis's statements and precludes liability in the absence of actual malice and a false statement of fact. As this court recognized in *Mount Juneau*:

> [T]he public figure test is not the only route to application of the actual malice standard. We further protect the free ex-

change of ideas by applying the actual malice standard to publications on issues of public interest and concern, even if the defamation plaintiff is not a public figure.... [46]

Citing *Pearson v. Fairbanks Publishing Co.*, we explained the rationale for such a policy as follows:

> On the one hand there is the interest in safeguarding the right to one's reputation. On the other hand there is the interest in allowing freedom of debate and expression on public questions and issues. We believe that a fair balance of these competing interests is achieved where the law of defamation permits one, without liability for damages, to comment, criticize and pass judgment on statements made by another on an issue or matter of public interest, even if such comment, criticism and judgment involves misstatements of fact—so long as such misstatements are relevant to the subject matter spoken or written about by the one claiming to be defamed and are not shown by him to have been made with actual malice.[47]

In *Gertz v. Robert Welch, Inc.*, the United States Supreme Court concluded that although the actual malice standard was appropriately applied to those who "occupy positions of such pervasive power and influence that they are deemed public figures for all purposes" and to limited-purpose public figures who have "thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved," a separate analysis is required with respect to private individuals.[48] The Court held that "so long as they do not impose liability without fault, the States may define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehoods injurious to a private individual."[49]

In the wake of *Gertz*, a majority of states have adopted a negligence standard with re-

---

**46.** *Mount Juneau Enters., Inc. v. Juneau Empire*, 891 P.2d 829, 837 (Alaska 1995).

**47.** *Id.* at 837–38 (citing *Pearson v. Fairbanks Publishing Co., Inc.*, 413 P.2d 711, 713 (Alaska 1966)).

**48.** 418 U.S. 323, 344–45, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

**49.** *Id.* at 347, 94 S.Ct. 2997.

spect to defamation claims brought by private individuals, making it easier for private plaintiffs to recover in defamation actions.[50] This court declined to follow suit in *Mount Juneau*, reaffirming its commitment to freedom of speech and expression on matters of public interest by adhering to the actual malice standard, even for private individuals. In *Taranto v. North Slope Borough*, we recognized a further extension of this privilege to speech on matters of public health and safety.[51] These cases reflect our consistent policy of balancing the need to safeguard an individual's reputation with the need for freedom of debate and expression on issues of public concern.[52]

To the extent that the court's opinion can be read to allow individuals to recover damages under IIED claims for speech that would otherwise be privileged as speech on a matter of public interest and concern, I would depart from its reasoning. Instead, in recognition of the inherent logic of *Falwell*, and in respect for the balance this court has consistently struck in favor of discussion on public issues, I would extend protection to Leykis's statement under the *Mount Juneau* privilege. Because I think it is clear that Leykis's comments related to a matter of public interest and concern, the *Mount Juneau* privilege applies, protecting all statements except false statements of fact made with malice.

## V. Conclusion

Because I disagree that Leykis encouraged his listeners to harass Carpenter, and because Leykis's speech is protected opinion speech directed at a public figure and a matter of public concern, I respectfully dissent from the court's opinion today.

**50.** *See, e.g.,* 1 Robert D. Sack, Sack on Defamation· Libel, Slander, and Related Problems § 6.1 (3d ed.2007).

**51.** 992 P.2d 1111, 1115 (Alaska 1999).

**52.** *See Gay v. Williams*, 486 F.Supp. 12, 16 (D.Alaska 1979) (interpreting Alaska law).